**PRESTON INSURANCE AGENCY, Appellant,**

v.

**Daryl MAY and wife, Faith May, Individually and as Next Friends of Jared Ryan May, Appellees.**

**No. 9749.**

Court of Appeals of Texas, Texarkana.

March 20, 1990.

Rehearing Denied April 24, 1990.

Hugo C. Schmidt, Saunders, Schmidt, Echols & Weathers, Tyler, Mike A. Hatchell, Ramey, Flock, Jeffus, Crawford, Harper, Tyler, for appellant.

Ron Adkison, Wellborn, Houston, Adkison, Mann, Sadler, Henderson, for appellees.

CORNELIUS, Chief Justice.

Preston Insurance Agency appeals from an adverse judgment in a damage suit brought against it by Mr. and Mrs. Daryl May. The Mays alleged that Preston and others negligently caused the loss of health insurance coverage for their son, which in turn caused them damages in unpaid medical and hospital bills, and mental anguish.

In 1982, on the recommendation of Daryl May's mother, the Mays went to the Preston Insurance Agency to seek health insurance coverage. They asked Preston's agent, Rex Wiley, about a "Double Eagle" group insurance policy plan which could be purchased through United Services Association of America. Mr. May's mother had told them about the policy. Patrons could become a member of United Services Asso-

ciation, and thus be eligible to purchase the group policy, by paying a $15.00 membership fee. At the time the Mays enrolled in the group, the group policy was written by Continental Bankers of the South, a company which had a C rating by the A.M. Best Company. The policy featured a reduced premium and a low deductible. United Services Association controlled the policy and had the power to replace the underwriting insurance company. The group policy allowed the insurance carrier to terminate the policy of the entire group at any time, but not as to individual members only. The right of termination was expressly stated in the policy and in the brochure describing the policy. The policy also contained a deferral provision concerning dependents who were hospitalized or totally disabled at the time coverage began which provided for deferred coverage until (1) the dependent was engaged in all the normal activities of a person in good health of the same age and sex, (2) there had been furnished satisfactory evidence of the dependent's insurability, and (3) the dependent was no longer confined to a medical facility.

In 1984, Continental terminated the group policy. An identical policy covering the group was then underwritten by Hermitage Insurance Company. The transfer of coverage occurred without any loss of benefits to any group members. In 1984, Jared May was born. He suffered from serious heart and liver difficulties which required major hospitalization. According to the terms of the policy, Jared was fully covered at his birth. In 1985, Hermitage terminated its policy and later became insolvent. The group policy was then picked up by Keystone Life, a company which had a B rating from A.M. Best Company. When Keystone discovered the condition of Jared May, it waived coverage as to him because he did not meet the requirements of the deferral rule contained in the policies.

The Mays sued the Preston Agency, United Services Association, Keystone, and Hermitage to recover the unpaid medical and hospital bills they had incurred for Jared, as well as damages for mental anguish and punitive damages. The suit was based on allegations of misrepresentation, fraud, bad faith, breach of implied warranty, breach of contract, negligence in exposing the child to lack of coverage, and negligence in failing to investigate the financial solvency of the insurance companies.

Only negligence and false misrepresentation questions were submitted to the jury. The jury found that Preston and United Services Association were negligent, but failed to find that any false representation had been made. They also failed to find gross negligence. Damages of $140,000.00 for unpaid medical expenses were awarded. Only Preston has appealed. In three points of error, it contends that there is no evidence to support the findings of negligence and damages, and that the undisputed evidence shows unpaid medical bills of only $19,000.00.

In reviewing a no evidence contention, we consider only the evidence tending to support the finding, viewing it in the light most favorable to the verdict, giving effect to all reasonable inferences that may properly be drawn therefrom and disregarding all contrary or conflicting evidence. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965). If there is any evidence, more than a scintilla, supporting the finding, the no evidence contention will be overruled.

The Mays contend on appeal that Preston was negligent in placing their insurance in a plan inadequate to their needs and which exposed them to the possibility of having no coverage on their child.

We find no evidence in the record of any negligent act on Preston's part which was a proximate cause of the loss of coverage.

It first should be noted that the Mays make no claim, and there is no evidence, that their child's loss of coverage was in any way caused by the insolvency, financial irresponsibility, or any kind of malfeasance or misfeasance on the part of any insurer. The only fact asserted to be a direct cause of the loss is that the group policies covering the Mays allowed the insurance company to terminate the policy as to the complete group, and that this termination right

caused a "switching of underwriters" which ultimately left Jared without coverage. Thus, any liability of Preston, the agent, must be based on some negligence on its part in securing for, or inducing the Mays to purchase, that type of policy.

Considering only that which bears on the question and which could conceivably support the Mays' case, the only evidence we find in the record on this issue is summarized as follows:

Rex Wiley testified that he learned about the Double Eagle group policy from literature he received from U.S.A.A., and he thought it was a good policy because it had lower rates, a low deductible which started at $100.00, and it only insured persons in good health.

Wiley testified that after securing the insurance coverage he became aware that Mrs. Faith May had become pregnant and he recalled discussions where the Mays told him they wanted to be sure that their baby was going to be covered. He assured them that the baby would be covered under the Double Eagle policy. When the child was born, he notified Mrs. Faith May to be sure that the child was listed on the policy as a dependent. In fact, Jared was listed on the policy and was fully covered by Hermitage for some fourteen months. Wiley testified that when the coverage was changed from Continental to Hermitage he had little concern because they were going to larger and better rated companies. He did not have any great concern until Keystone took over and he discovered what it was "doing to the customers," but then it was too late to help the Mays because Jared had been born during coverage by Hermitage, and when Keystone picked up the coverage Jared was uninsurable.

Wiley also testified that there are insurance brokers who put people with a single company and they stay with that company, and if that happens the problem of changing underwriters is avoided. He acknowledged that if there had been no change of insurance underwriters in this instance Jared would have been covered all the time. The first time he discovered there was some danger to the coverage for Jared was when Mrs. May called him and told him that they had turned them down on some claims. That was several months after Keystone had taken over.

Wiley testified that when he initially met with Mrs. Faith May and with her mother-in-law he explained to both of them that the group policy could be terminated by the underwriter. The brochure he gave the Mays had a paragraph entitled "Termination of the Policy," and he read that paragraph to the Mays to be sure they understood it. He explained to them that they were joining an association in order to get the policy and that the association would have control of the policy and could move it from one company to another and that any insurer could terminate the policy within thirty-one days. He also stated that he provided information to Mrs. May's mother-in-law about other companies that furnished insurance, one of which was Reserve Life, which offered an individual plan. He said, however, that the Reserve policy also gave the company the right to terminate or cancel as to the entire group.

Mrs. Faith May testified that when she was considering purchasing the insurance she was given the brochure Mr. Wiley testified about. She said she told Wiley that she and her husband were thinking about starting their family and that she wanted to be certain that their child would be covered. She told Wiley they would like to have a policy they could afford, but that they wanted it to be a good one, and that Wiley told them the Double Eagle policy was such a policy. She further stated that she could remember being shown only one policy.

Mrs. May further testified that she was aware from conversations with Mr. Wiley that any of the carriers could cancel the entire group, and that she had received a letter from U.S.A.A. which told her that the group was being cancelled. She was aware from what Mr. Wiley told her that that could happen and she was also aware that there was nothing that U.S.A.A. could do about it if the carrier decided to cancel the policy.

She said that when she went to the Preston Agency there was only one policy she was going to talk about. That was the Double Eagle policy that she and her husband had spoken about after it had been recommended to them by her mother-in-law, and that they basically had decided that it sounded good, but they wanted to ask the agent some more questions. They specifically requested maternity benefits, and they were added into the policy.

Mr. Wiley told them that the only way the policy could terminate was if they did not make their payments or if the insurance company cancelled the entire plan, but that they could not single out any one family and cancel them. She stated that she was familiar with the brochure and had read the termination provision. She said,

> [W]hen I purchased the policy I understood that the policy could be canceled by the total Double Eagle people, everyone, all 100 or ever how many families were involved, or if Daryl and I personally did not make our payments. I understood that we could lose it that way.

Mrs. May testified that when she became pregnant she called to tell Mr. Wiley and ask if this was going to affect anything, and he told her, "[N]o, ... they would pick up just where Continental Bankers left off." Mrs. May, when asked if the Preston Agency had misrepresented anything to her, stated that, "They sold me a policy, and they told me that my son or any child that I would have would be covered, and my son lived for three years and three months, and was only covered for eleven months." She did agree, however, that Mr. Wiley told her the policy could be terminated—the entire policy—and that both Continental and Hermitage terminated their policies as to all persons in the group. She further stated that after Hermitage cancelled she actually received another policy of insurance from Keystone, and that it had the same kind of dependent coverage that the other policies had.

When asked if she had any other complaint about the insurance companies, she said, "No. The only thing I wish, if Hermitage had not of dropped the Double Eagle policy, then we would have never have been in this boat, but that is irrevocable." She further stated, "That is one of the things we were warned about. We were told that they could cancel the entire Double Eagle plan, which is what Hermitage did, to the best of my knowledge...." She further stated, "It wasn't gone into detail the fact that we might go through five insurance companies."

■ An insurance agent or broker is not liable for an insured's loss of claim or coverage, unless at the time the policy is purchased or at some later time when the insured could be protected, the agent knows or should know of facts which would put a reasonable agent on notice that the insurance presents an unreasonable risk, and then fails to use reasonable care to protect the insured. *Higginbotham & Associates, Inc. v. Greer*, 738 S.W.2d 45 (Tex.App.–Texarkana 1987, writ denied). When the insured is fully apprised of the risk, and voluntarily chooses the policy and accepts that risk, the agent's act in placing the coverage is not a proximate cause of the loss. *Higginbotham & Associates, Inc. v. Greer*, supra, and authorities there cited.

■ The undisputed evidence in this case shows that the Mays were fully aware of the termination right contained in the policy they chose, and were fully aware that if the insurance company chose to terminate the policy as to the whole group, as it had a right to do, they and their dependents could lose coverage. It is also undisputed that the Mays were as aware of the possibilities for a "shifting of underwriters" as was the Preston Agency. Moreover, it is uncontroverted that Preston did not cause or contribute to the termination of the policy by Hermitage, and since Jared was uninsurable, according to the policy terms, when Keystone picked up the policy, Preston could do nothing to prevent the loss of his coverage. In light of this undisputed evidence, there is no evidence of any negligent act on the part of Preston which was a proximate cause of the loss of coverage.

It is not necessary for us to consider Preston's remaining points. For the rea-

sons stated, the judgment of the trial court is reversed and judgment is here rendered that the Mays take nothing.