Daryl MAY and Wife, Faith May,
Individually and as Next Friends
for Jared Ryan May

v.

UNITED SERVICES ASSOCIATION
OF AMERICA, the Preston
Agency, Inc., et al.

No. C–9989.

Supreme Court of Texas.

Dec. 22, 1992.

Rehearing Overruled Jan. 20, 1993.

Ron Adkison, J. Mitchell Beard, Wellborn, Houston, Adkison, Mann, Sadler & Hill, Henderson, for petitioners.

Mike Hatchell, Gregory D. Smith, Ramey & Flock, P.C., Tyler, Hugo C. Schmidt, Saunders, Schmidt & Echols, Tyler, for respondents.

OPINION

PHILLIPS, Chief Justice.

This case involves the scope of an insurance agent's common-law duty to a customer in rendering advice about and procuring a policy for health insurance. The plaintiffs asserted only common-law causes of action, making no claim under the Texas Deceptive Trade Practices–Consumer Protection Act, Tex.Bus. & Com.Code §§ 17.41 *et seq.* or any other statute. While the jury found favorably for the plaintiffs on a claim of the agent's negligence, it failed to find for the plaintiffs as to misrepresentation. On this verdict, the trial court rendered judgment for the plaintiffs, but the court of appeals reversed. 788 S.W.2d 608. We affirm the judgment of the court of appeals because there is no evidence in the record before us that the agent breached the duty to use reasonable care, skill and diligence in procuring insurance in any way

that proximately caused harm to the petitioners.

*Facts*

To reverse the judgment of the court of appeals, the petitioners, Daryl and Faith May, must demonstrate that some evidence in the record supports the verdict in their favor. The evidence most favorable to the Mays is that, because health insurance was not provided by Daryl's employer, they decided to take out a health insurance policy shortly after their marriage in December of 1982. Daryl's mother, Alice May, worked next door to Preston Insurance Agency, Inc. ("Preston"), from which Daryl had previously purchased automobile insurance. As a favor, Alice told Faith that she would find out what health insurance policies Preston offered. Alice visited Preston and spoke with one of the agents there, Rex Wiley. When she returned, she gave Faith a brochure describing the "Double Eagle" group policy.

The Double Eagle policy was underwritten by Continental Bankers of the South ("Continental") and could be purchased by members [1] of the United Services Association of America ("United").[2] The Double Eagle policy featured relatively low premiums and deductibles, but its termination provision allowed the underwriter to cancel the entire group at any time. The policy also contained a deferral provision that permitted the underwriter to defer coverage on group members or covered dependents who were hospitalized or totally disabled at the time coverage began.[3]

On March 16, 1983, Faith May visited the Preston Agency herself and spoke with Wiley about the Double Eagle policy. Wiley explained the basic provisions of the policy to her, though he did not tell her that Continental had only received a "C" rating from the A.M. Best Company,[4] nor that Preston sold other coverages, including an individual health policy from Reserve Life.

In a prior marriage, Faith May had lost an infant child. Because the Mays were planning to have children of their own, they were interested in maternity and dependent health coverage. They told Wiley that they were concerned about covering medical expenses associated with pregnancy and childbirth. Wiley added a handwritten maternity rider to the policy. The Mays then joined the United group for a fifteen dollar membership fee and purchased the Double Eagle policy. Their coverage began on April 1, 1983.

In mid–1984, the Mays received notice that Continental had terminated the entire United group, and that another underwriter, Hermitage Insurance Company ("Hermitage"), had agreed to underwrite a plan with identical Double Eagle plan benefits for all United members previously insured by Continental. Faith May was pregnant at the time. Upon learning of the change in underwriters, she telephoned Wiley to determine what effect the change would have on the Mays' coverage. Wiley told her that Hermitage would continue to cov-

---

1. In order to be eligible for the Double Eagle plan, an individual had to be a member of an approved Association (such as the United group), actively working full-time, under the age of 65, and not confined in a hospital or custodial care facility. The United membership application required the applicant to indicate whether the applicant or any member of his family had ever suffered from any of a variety of medical problems including stroke, heart attack, high blood pressure, diabetes, cancer, ulcer, disorders of the back, bones, kidneys, liver, lungs, eyes or nervous system, alcoholism or other problems.

2. United bears no relation to United Services Automobile Association, frequently referred to as "USAA", a larger insurance company headquartered in San Antonio.

3. The underwriter could defer dependent coverage until (i) the dependent was engaged in all the normal activities of a person in good health of the same age and sex; (ii) the insured furnished satisfactory evidence of the dependent's insurability; and (iii) the dependent was not confined in a medical facility. The insurer could defer coverage if any one of these criteria was not met "on the date that insurance hereunder is initially to take effect for any one dependent."

4. The A.M. Best Company is the oldest insurance rating firm in the United States. Its ratings are based on the performance and financial strength of insurance companies. The ratings range from A+ (superior) to C− (fair).

er them on the same terms as Continental. Jared May was born on August 1, 1984, with congenital heart and lung disorders that required immediate medical attention. Hermitage covered his medical expenses under the policy.

In July 1985, however, Hermitage also terminated the United group. Keystone Life Insurance Company ("Keystone") then voluntarily assumed the group. Keystone, however, classified Jared May as a totally disabled dependent and, asserting the deferral provision of the policy, refused to cover any of his medical expenses. Pursuant to the terms of the policy, Hermitage covered Jared May for ninety days after termination, until September 30, 1985. Thereafter, however, Jared May was without insurance coverage until he died in November of 1987.

On January 27, 1987, the Mays filed suit against Preston, United, Keystone, and Hermitage seeking actual damages for unpaid medical bills and mental anguish, punitive damages and interest. Their causes of action against Keystone and Hermitage were severed because both companies were involved in receivership proceedings. Against United and Preston, the Mays alleged a number of common law causes of action, including misrepresentation and negligence.[5] Although the jury failed to find misrepresentation,[6] it did find that the negligence of both United and Preston proximately caused the Mays' injuries,[7] assessing their percentages of causation at 60% and 40%, respectively. The jury

awarded $140,000 in damages for unpaid medical expenses and $40,000 in exemplary damages against Preston and United each. The jury awarded no damages for mental anguish. As the jury failed to find gross negligence against either defendant, the trial court rendered judgment against Preston and United jointly and severally for $140,000 plus interest and costs.

Only Preston appealed. The court of appeals, holding that there was no evidence of a negligent act by Preston that was a proximate cause of the loss of the Mays' coverage, reversed the trial court's judgment as to Preston's liability and rendered judgment that the Mays take nothing.

The questions submitted to the jury in this case did not require the jury to specify a particular negligent act by Preston. *See* note 7, *supra*. Therefore, we must reverse the judgment of the court of appeals and render judgment on the jury verdict if there is any evidence that any of Preston's alleged failures constituted negligence and proximately caused the Mays' loss.

The Mays went to trial on a pleading alleging negligence in three particulars: (1) Preston was "negligent in placing the coverage of the Mays with [Hermitage and/or Keystone] in that it exposed them to the possibility of having no coverage on their minor child," as Preston "knew or should have known, of the danger of placing Plaintiffs in such a plan where the shifting of the insurance coverage could subject them to just exactly this type of catastrophic

**5.** The Mays did not make any claims against Preston or United for violation of any statutory obligations.

**6.** The jury responded as follows to the first three questions of the court's charge:

Question 1: Did any party named below make any representation to Faith May or Daryl May about the quality, character, or type of coverage available under the Double Eagle Plan?

Answer: Preston: Yes
United: Yes

Question 2: Did Faith or Daryl May rely on any such representation made in enrolling in the Double Eagle Plan?

Answer: Preston: Yes
United: Yes

Question 3: Was such representation relied upon untrue?

Answer: Preston: No
United: No

**7.** The jury responded as follows to Question 6 of the court's charge:

Did the negligence, if any, of the parties below proximately cause the loss, if any, in question?

Answer: Preston: Yes
United: Yes

event;" (2) Preston was negligent "in placing the coverage of the Mays with [Hermitage and/or Keystone] in that [Preston] failed to investigate the financial solvency of the other Defendants to insure that the Plaintiffs would have insurance with a solvent company;" and (3) Preston was "negligent in placing the coverage with a near insolvent or potentially insolvent insurance company." We will address the first theory separately from the latter two.

Negligence in Selecting the Double Eagle Policy

■ The first theory charges that Preston was negligent in failing to procure for the Mays the type of policy that they requested or that would insure them against the risk they identified as important in their conversation with Wiley. It is established in Texas that an insurance agent[8] who undertakes to procure insurance for another owes a duty to a client to use reasonable diligence in attempting to place the requested insurance and to inform the client promptly if unable to do so. In *Burroughs v. Bunch*, 210 S.W.2d 211 (Tex.Civ. App.—El Paso 1948, writ ref'd), an agent

was held liable for fire damage to a house being built by his customer when the agent, after agreeing to have a builder's risk policy issued on the house, failed to notify the customer that he had not procured such a policy. *Id.* at 214. Similarly, in *Scott v. Conner*, 403 S.W.2d 453 (Tex. Civ.App.—Beaumont 1966, no writ), an agent was held liable for fire damage after his customer requested a new policy to replace one cancelled by the insurer, and the agent neither procured such a replacement policy nor alerted the customer to this failure by returning the unearned portion of the premium from the original policy. *Id.* at 458.

Liability was imposed in the *Burroughs* and *Scott* cases because the agent induced the plaintiff to rely on his performance of the undertaking to procure insurance, and the plaintiff reasonably, but to his detriment, assumed that he was insured against the risk that caused his loss. *See Burroughs*, 210 S.W.2d at 213–14; *Scott*, 403 S.W.2d at 458.[9] Unlike the plaintiffs in the *Burroughs* and *Scott* cases, however, the Mays were not misled into believing that a

8. In several states, a distinction is made between insurance agents and insurance brokers, the former representing a single insurer and the latter selling the policies of several different insurers. As the court explained in *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 264 (7th Cir.1986) (quoting *Galiher v. Spates*, 129 Ill. App.2d 204, 262 N.E.2d 626, 628 (1970)):

"[A broker] procures insurance and acts as middleman between the insured and the insurer, and solicits insurance business from the public under no employment from any special company, but, having secured an order, places the insurance with the company selected by the insured, or, in the absence of any selection by him, with the company selected by such broker...." An insurance agent, on the other hand, has a fixed and permanent relationship to an insurance company that the agent represents and has certain duties and allegiances to that company.

*See also* 1 Bertram Harnett, *Responsibilities of Insurance Agents and Brokers* § 2.02 (1991 & Supp.); 3 *Couch on Insurance 2d* § 25:95, 448–55 (Rev. ed. 1984 & Supp.1990).

Although some Texas courts have used the term "insurance broker" in this sense, *see, e.g., Foundation Reserve Insurance Co. v. Wesson*, 447 S.W.2d 436, 438 (Tex.Civ.App.—Dallas 1969, writ ref'd); *Zurich General Accident & Liability Insurance Co. v. Fort Worth Laundry Co.*, 58

S.W.2d 1058, 1059 (Tex.Civ.App.—Fort Worth 1933, no writ), the broker/agent distinction is not found in the Texas Insurance Code. Although the Code does distinguish in some contexts between local recording agents and soliciting agents, Tex.Ins.Code art. 21.14, this categorization does not apply to agents selling life, health and accident insurance, Tex.Ins.Code art. 21.14 § 20. *See also* Tex.Ins.Code art. 21.07–1 § 16 (Vernon Supp.1992) (providing separate licensing requirements for "accident and health insurance agents"). Because this case involves only the sale of a health insurance policy, we do not address the differing duties imposed on Texas local recording agents and soliciting agents.

9. *See also Alford v. Tudor Hall and Associates, Inc.*, 75 N.C.App. 279, 330 S.E.2d 830, 832 (the law imposes on the agent the duty to perform the task of procuring or renewing insurance if he has promised to do so or given assurances " 'under circumstances which lull the insured into the belief that such insurance has been effected' ") (quoting 3 *Couch on Insurance 2d* § 25:46, at 370 (Rev. ed. 1984)), *disc. review denied*, 315 N.C. 182, 337 S.E.2d 855 (1985); *Trahan v. Bailey's Equipment Rentals, Inc.*, 383 So.2d 1072, 1076 (La.App.) (the client can recover from the agent "if the agent's conduct warrants the assumption by the client that he is so covered"), *writ denied*, 391 So.2d 455 (La.1980).

policy in their name existed. Moreover, they were not led wrongly to believe that their policy provided protection against a particular risk that was in fact excluded from the policy's coverage. *See Rainey–Mapes v. Queen Charters, Inc.*, 729 S.W.2d 907, 913–14 (Tex.App.—San Antonio 1987, writ dism'd by agr.) (agent gave assurances that shipowner's contemplated trip from the Virgin Islands to Houston would be covered, when in fact policy contained a territorial exclusion clause encompassing points along that route); *see also Pete's Satire, Inc. v. Commercial Insurance Co.*, 698 P.2d 1388, 1389–90 (Colo.App.1985) (agent misrepresented that policy covered bar against risks relating to patrons' consumption of alcoholic beverages), *aff'd*, 739 P.2d 239 (Colo.1987); *cf. Darner Motor Sales, Inc. v. Universal Underwriters Insurance Co.*, 140 Ariz. 383, 682 P.2d 388, 390 (1984) (employee of insurer misrepre-

sented that "umbrella" policy would supplement the liability coverage available to insured's lessees under the primary policy).[10]

The Mays failed to obtain favorable jury findings as to misrepresentation, and Faith May acknowledged at trial that Wiley told her of the termination provision allowing an underwriter to cancel coverage for the entire group. Rather, the Mays' first negligence claim directly challenges Wiley's professional judgment in recommending the Double Eagle policy to Alice May and in allowing Daryl and Faith May to purchase it.[11] We have found no Texas cases addressing a similar claim,[12] and few from any jurisdiction.

One such case is *Jones v. Grewe*, 189 Cal.App.3d 950, 234 Cal.Rptr. 717 (1987). There, the holders of a $300,000 liability insurance policy on an apartment complex

---

**10.** Some courts have extended this theory of agent liability beyond affirmative misrepresentations to failures to disclose some limitation in the policy's coverage. Usually, though, courts have done so only if there is an explicit agreement, a course of dealing, or other evidence establishing an undertaking by the agent to determine the customer's insurance needs and to counsel the customer as to how they can best be met. *Compare Stein, Hinkle, Dawe & Associates, Inc. v. Continental Casualty Co.*, 110 Mich. App. 410, 313 N.W.2d 299, 302–03 (1981) (agent liable for failing to warn customers that their malpractice insurance policy required a "prior acts" endorsement to provide continuous coverage for past acts of negligence, where a "special relationship" had been created by ten years of transactions between customers and agency) *with Nowell v. Dawn–Leavitt Agency, Inc.*, 127 Ariz. 48, 52, 617 P.2d 1164, 1168 (1980) (affirming summary judgment in favor of agent who failed to advise customer that the homeowner's policy she requested did not include flood coverage, where the parties' prior dealings "negate[d] the kind of relationship of entrustment and initiative which is the basis for liability"). We need not decide whether we would follow a similar approach, or whether such a relationship of entrustment existed in this case, because the Mays do not contend that Wiley failed to disclose any limitation in the Double Eagle policy's coverage.

**11.** This is not a case in which the agent neglected to apprise himself of the terms of the policy he procured or failed to understand their operation. *See, e.g., Rider v. Lynch*, 42 N.J. 465, 201 A.2d 561 (1964); *see also Continental Casualty Co. v. Bock*, 340 S.W.2d 527, 532 (Tex.Civ.App.—

Houston 1960, writ ref'd n.r.e.) (beneficiary of customer who obtained policy inapplicable to the type of flight for which he sought coverage could not reform policy to recover against insurer, suggesting in dicta that it was agent's responsibility to examine policy and verify that proper coverage was provided).

**12.** Justice Doggett in his dissent relies upon the duty of an agent acknowledged in *Trinity Universal Insurance Co. v. Burnette*, 560 S.W.2d 440 (Tex.Civ.App.—Beaumont 1977, no writ): to keep his or her clients fully informed so that they can remain safely insured. Although we express no view on the correctness of this holding or the court's formulation of the agent's duty, we note that Wiley did not breach the duty articulated in *Burnette*. In that case, the insured held an automatically renewable policy, but the agent failed to renew it or to inform the insured that it had not been renewed. Like the *Burroughs* and *Scott* plaintiffs, the Burnettes sued the agent for the loss of their home to fire "at a time when plaintiffs believed that it was insured by a Trinity policy issued by the local agent." *Id.* at 441. *See also Kitching v. Zamora*, 695 S.W.2d 553 (Tex.1985) (agent received a renewal notice regarding the insured's policy but failed to alert insured to the impending expiration; agent held liable for failure to notify). The Mays, however, are *not* suing based upon an erroneous belief that coverage existed for the loss they suffered. Their first negligence theory focuses on Wiley's exercise of judgment in allowing them to purchase the Double Eagle policy initially, and not on any subsequent omission that caused them to lose coverage for Jared.

sued their insurance agent for negligence after settling a claim arising from a swimming pool accident for $1.5 million. Their complaint alleged that the agent was negligent in failing to provide liability insurance sufficient to protect their personal assets. Acknowledging the general duty implied by the agency relationship to use reasonable diligence and judgment in procuring the insurance requested by an insured, 234 Cal. Rptr. at 719, the court treated the issue as whether the complaint alleged facts from which a broader agency relationship to secure complete liability protection could be inferred. *Id.* at 720. The court held that neither a request for "sufficient" coverage nor the agent's assurance of the adequacy of liability coverage could support such a broader agreement; allowing such an inference "would in effect make the agent a blanket insurer for his principal." *Id.* at 721; *accord Sandbulte v. Farm Bureau Mutual Insurance Co.,* 343 N.W.2d 457, 465 (Iowa 1984).[13]

*Sobotor v. Prudential Property & Casualty Insurance Co.,* 200 N.J.Super. 333, 491 A.2d 737 (1984) (per curiam), also involved a claim of negligent procurement with no allegation that the plaintiff was misled in any way about the coverage obtained. There, an agent was sued by a customer who, despite requesting the "best available" automobile insurance package, received only the minimum uninsured-underinsured motorist coverage required by state law and was subsequently struck by an underinsured driver. The plaintiff introduced evidence that at the time of his request the agent was authorized to issue a policy from the same insurer that, for an additional five-dollar premium, provided over six times as much per-person coverage and ten times as much per-accident coverage. The court viewed the additional duty claimed to have been violated as simply one to inform a customer of the available options. The court concluded that the agent

had been negligent, and that through his request for the "best available" insurance the customer had put the agent on notice of reliance on his expertise. *Id.* at 741–42.

Several other courts have imposed liability where the client, though not misled in any way about his or her coverage, was misled about how that coverage compared to other policies. *See Bates v. Gambino,* 72 N.J. 219, 370 A.2d 10, 13 (1977) (per curiam) (because of agent's ignorance of applicable regulations, customers believed they could not obtain temporary coverage while their application was being considered); *Seascape of Hickory Point Condominium Association, Inc. v. Associated Insurance Services, Inc.,* 443 So.2d 488, 491 (Fla.App.1984) (agency repeatedly advised customer that insurance to protect a seawall against storm damage did not exist, when in fact the availability of such insurance was widely known among insurance professionals).

Although they have followed different approaches, these courts, departing from the theory of *Burroughs, Scott,* and *Rainey–Mapes,* have allowed the possibility of liability against an agent for negligent procurement based not on the customer's reliance on the existence or scope of coverage, but simply on the agent's failure to perform his duties with sufficient skill. *See Bates,* 370 A.2d at 12.

In the case before us, Faith May testified that in seeking health insurance from Preston, she told Wiley that she had previously lost a child and wanted to make sure that any policy she purchased for herself and her husband "would cover my pregnancy and any testing that I may need to have, and then any child and any problems that he may have or any testing that a child would have at birth." She also told Wiley that she and her husband "would like to have an insurance policy that we could

---

**13.** The situation confronted in *Jones* is distinct from one in which the "adequacy" of a policy can be assessed by some objective measure. In *McAlvain v. General Insurance Co. of America,* 97 Idaho 777, 554 P.2d 955 (1976), for example, an insurance agent was held liable for negligence after the customer requested sufficient insurance to cover his business, including inventory, fully, and furnished to the agent an appraisal showing that the inventory was worth $45,000, and the agent procured a policy with a $30,000 limit. *See also Crump v. Geer Brothers, Inc.,* 336 So.2d 1091 (Ala.1976).

afford, but we wanted to be guaranteed that it was a good policy." In response to this request, Wiley procured for them the Double Eagle policy with the maternity rider. This policy, according to his testimony, achieved lower rates and lower deductibles by its group structure and by excluding persons who could not answer the health questions affirmatively.[14]

The shortcoming of the Double Eagle policy, as events developed for the Mays, was the interaction of the termination and the deferral provisions. The deferral provision became applicable anew for all insured individuals when there was a change of underwriters. Thus, hospitalized or disabled individuals whose medical care was covered because they became disabled at a time when they were already covered under the policy, or because they were born to individuals who were covered under the policy,[15] faced the risk that they would lose coverage if the current underwriter dropped the entire group and a new underwriter took over.

The Mays contend that the procurement of a policy with this limitation in response to their request was negligent. Like the *Jones* plaintiffs, however, they base their claim solely on a limitation of coverage about which they were fully apprised, and

do not identify a particular negligent failure by Wiley. The Mays claim that Wiley was negligent because he should have known of the risk posed to them by the potential shifting of the underwriters, but they offer no evidence as to why this risk was unjustified for them in particular, or why Wiley should have prevented them from assuming it. Their claim does not rest on the theory that, with greater familiarity with or attention to the details of the Mays' situation, Wiley would have realized the policy was inappropriate.[16] Under their theory, any of the seventy to eighty customers for whom Wiley also procured Double Eagle policies would have equally valid negligence claims against Wiley for any uncovered losses. *Jones* well captures the infeasibility of such a cause of action grounded solely on the failure to obtain complete insurance protection: if a breach of due care can be proved without a more concrete showing than a subsequent failure of coverage, agents would be rendered "blanket insurers." [17]

Unquestionably, Wiley could have done a better job by ascertaining whether the Mays would have preferred to pay a higher premium for a nongroup policy without a comparable termination provision.[18] How-

---

14. We disagree with Justice Gammage's contention in his dissenting opinion that under "no evidence" review we must disregard this testimony. Wiley testified that he was initially attracted to the Double Eagle policy because of its low premiums. When asked how much of a difference there was between its premiums and those of a nongroup policy, Wiley responded, "Oh, I don't know." This answer alone hardly creates a conflict in the evidence which we must resolve favorably to the jury verdict; the question itself is phrased in a manner that acknowledges Wiley's earlier statement that the premiums were lower. The Mays made no attempt to prove that the Double Eagle's premiums were *not* in fact lower than those of nongroup policies with comparable coverage.

15. Though the trial testimony does not specifically address this point, it appears from the policy summary introduced into evidence by the Mays that newborn dependents were not subject to the deferral rule, and therefore Hermitage could not have denied coverage for Jared under that provision. On cross-examination, Wiley admitted that without the change of underwriters, Jared would have been fully covered.

16. *Frank B. Hall & Co. v. Beach, Inc.,* 733 S.W.2d 251 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.), relied upon by Justice Doggett in his dissent, is inapposite for this reason.

17. Justice Doggett criticizes this holding as a usurpation of the jury's role, pointing to *Kabban v. Mackin,* 104 Or.App. 422, 801 P.2d 883 (1990). There, the court remanded because the trial judge had improperly included in the jury instruction an expert's conclusion as to what standard industry practice demanded of the agent under the particular facts of the case. *Id.* 801 P.2d at 891. In the present case, the Mays offered *no* evidence of the type improperly given conclusive weight in *Kabban;* they did not present any witness to testify as to whether Wiley's actions accorded with standard industry practice. It is difficult to see how application of the *Kabban* holding could lead to a different disposition than the one we reach today.

18. Justice Gammage maintains in his dissent that there is evidence that Wiley had a financial motive to push the Double Eagle over other policies. We disagree. Although the testimony of one of the witnesses does suggest that the

ever, under the facts of this case, we do not believe that this failure constitutes any evidence of negligence. There is no testimony that Faith May ever asked to see different policies or even expressed any dissatisfaction with the Double Eagle. Unlike the *Sobotor* customer, whose request for the "best available" policy implies a comparison to obtain the most complete coverage and makes the agent's failure to advise of policies with higher limits a material nondisclosure, the Mays conveyed no such wish to Wiley.

Therefore, we hold that there is no evidence to support the Mays' first negligence theory.

### Negligence in Failing to Investigate the Underwriters

■ The Mays' second and third theories allege that Preston was negligent in placing the coverage because Wiley either failed to investigate, or failed to adequately investigate, the financial solvency of Hermitage and Keystone, or if he did discover the financial condition of the underwriters, he was negligent for nonetheless placing the Mays' coverage with them.

At the time Wiley placed the coverage in 1983, Hermitage and Keystone were not yet in the picture; the underwriter was Continental.[19] It is therefore difficult to see how any negligence by Wiley in investigating Hermitage or Keystone could be relevant to the earlier decision to place the Mays in the United group and procure the Double Eagle policy. Even reading their complaint in the most generous light possible—that is, construing it to allege negligence by Wiley in failing to withdraw the Mays from the Double Eagle plan when Hermitage or Keystone took over because he did not investigate those companies—we cannot discern a viable claim under the facts of this case.

Although at trial and in the Mays' brief to this Court much is made of the facts that Hermitage had a "C" rating from A.M. Best and that Hermitage and Keystone eventually ended up in receivership, there is no showing of how the financial condition of any of these companies contributed to the Mays' loss. No claims under the policy went unpaid because of the insolvency of any underwriter.[20] Hermitage did not go into receivership in Texas until twenty-one months after it had cancelled the United group, and Faith May testified at trial that as far as she knew all claims she made while Hermitage was the underwriter were paid. The receiver for Hermitage was granted a directed verdict on this basis. There is no evidence (or any allegation) that Keystone's decision to exclude Jared from coverage under the deferral provision was a consequence of a weak or precarious financial condition. The only potentially meritorious claim of harm the Mays could make is that Hermitage's decision to drop the United group—which exposed Jared to the possibility of being excluded under the deferral provision by Hermitage's successor—was prompted by its poor financial condition. There is, however, no testimony in the record to support this theory.

controlling shareholder of the agent of record formed the United group, there was no showing that the operation was a scam to benefit the agent of record or the writing agents such as Wiley, or even that it was more profitable for Wiley than other policies he could have sold. Mary Damiani, an employee of United's agent of record, testified that at the time Keystone was underwriting the group, thirty-six percent of customers' premiums went to the agent of record. At a separate point in the trial, Wiley testified that writing agents' commissions on the Double Eagle probably averaged around fifteen percent of the total premium. Neither separately nor collectively do these bits of testimony raise an inference of self-dealing. The Mays produced no evidence as to what percentage was normal in the profession for an agent of record, nor did they attempt to show that Wiley's commissions on the Double Eagle policy were higher than those he could have received by selling the Mays a different policy.

**19.** The Mays do not contend, nor is there evidence to suggest, that Preston had any role in enlisting a succeeding underwriter for the United group after Continental and subsequently Hermitage terminated coverage.

**20.** This fact by itself distinguishes *Higginbotham & Associates, Inc. v. Greer*, 738 S.W.2d 45 (Tex. App.—Texarkana 1987, writ denied), and *Hancock v. Wilson*, 173 S.W. 1171 (Tex.Civ.App.—Dallas 1915, no writ).

Consequently, we hold there is no evidence that either any failure by Wiley to discover Hermitage or Keystone's financial condition, or any decision to place coverage with them notwithstanding their financial weakness, proximately caused harm to the Mays.

Because there is no evidence to support the jury's finding as to any of the three theories alleged in the Mays' complaint, the judgment of the court of appeals was proper. We affirm.

DOGGETT, Justice, dissenting.

All members of the court seem to agree that a professional insurance agent has a responsibility to disclose certain information to assist a client in making an informed decision. The debate today is limited to whether there is any evidence of the negligence of the agent who dealt with this particular East Texas family. The Rusk County jury that heard the case found that the agent failed to use ordinary care in selling the Mays an insurance policy. Increasingly, however, when this majority disagrees with a jury verdict, it simply replaces the deliberations of twelve members of the local community with the preferences of a majority of the "high nine" in Austin.[1] Today this disturbing trend continues.

In reviewing a "no evidence" point, this court "must consider only the evidence and inferences tending to support the jury's finding, viewed most favorably in support of the finding, and disregard all contrary evidence and inferences." *Havner v. E–Z Mart Stores, Inc.,* 825 S.W.2d 456, 458 (Tex.1992); *State v. $11,014.00,* 820 S.W.2d 783 (Tex.1991) (per curiam); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). In concluding that there is no evidence of negligence "under the facts of this case," the majority ignores this long-standing rule and instead reweighs the evidence to determine its factual sufficiency. Where more than a "scintilla" of evidence exists to support a finding, we remand to the court of appeals to perform a factual insufficiency review. Because no challenge was made to the sufficiency of the evidence in the court of appeals, the majority, under our ordinary procedure, has been denied the ability to order a remand. Nevertheless, rushing to the rescue, today's opinion transforms something into nothing by categorizing what clearly is *some* evidence as *no* evidence.

Here the jury found that the insurance agent made no misrepresentations, but was nonetheless negligent in advising the Mays. I do not personally view the evidence underlying that finding to be overwhelmingly persuasive. In fact, I disagree with Justice Gammage that this agent may have breached his duties to the Mays for personal financial gain. Making a reasonable profit is hardly illegal; indeed, it is at the core of our economic system. There is no evidence that this agent, Rex Wiley, could not have earned just as much from selling the Mays a different policy. Even without such a comparison, in some instances a jury may be entitled to infer an improper financial motive, but that cannot be done on this record, nor here is this even a relevant consideration. Regardless of Wiley's state of mind, his failure to make a reasonable disclosure to his clients was some evidence of negligence.

When Faith May sought an affordable "good policy" that would provide coverage for any future children, she entrusted to Wiley the job of assessing the available alternatives and advising her as to the most appropriate coverage. He not only failed to make such an evaluation, but neglected to inform the Mays that there were any alternatives to the policy he recommended. While emphasizing Wiley's disclosure of the particular termination clause that eventually caused coverage to lapse, *see* 844 S.W.2d at 670 n. 10, the majority fails to note that the Mays had no way of knowing whether there were any available alternatives to better meet their needs or

---

**1.** *See, e.g., Boyles v. Kerr,* —— S.W.2d ——, —— (Tex.1992) (Doggett, J., dissenting); *Leleaux v. Hamshire–Fannett I.S.D.,* 835 S.W.2d 49, 55–56 (Tex.1992) (Doggett, J., dissenting); *Reagan v.* *Vaughn,* 804 S.W.2d 463, 491 (Tex.1991) (Doggett, J., concurring and dissenting); *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 527 (Tex.1990) (Doggett, J., dissenting).

whether this was standard boilerplate found in every insurance policy. Whatever Wiley's motives for failing to disclose the substance of the available options, or even their existence, that failure was some evidence of negligence.

An insurance agent, like other professionals, is not a guarantor of the client's happiness and should not be subject to liability any time the client is dissatisfied. Nor should the fact that the agent earns a reasonable profit from providing a service, by itself, be evidence the service has been negligently performed. But as the agent should not bear responsibility for every bad result, neither should the consumer.

An insurance agent is required to "keep his clients fully informed so that they can remain safely insured." *Trinity Universal Ins. Co. v. Burnette*, 560 S.W.2d 440, 442 (Tex.Civ.App.—Beaumont 1977, no writ) (quoting *Cateora v. British Atlantic Assurance, Ltd.*, 282 F.Supp. 167, 174 (S.D.Tex.1968)). In *Frank B. Hall & Co. v. Beach, Inc.*, 733 S.W.2d 251, 261 (Tex. App.—Corpus Christi 1987, writ ref'd n.r.e.), the court upheld a jury finding that an insurance agent was negligent in failing to "thoroughly acquaint himself" with his client's needs and in failing to procure the coverage most appropriate to fulfill them. *See also Kitching v. Zamora*, 695 S.W.2d 553 (Tex.1985). Recognizing that insurance agents must exercise reasonable care in advising consumers, the majority cites a number of opinions from other states, such as *Sobotor v. Property & Casualty Ins. Co.*, 200 N.J.Super. 333, 491 A.2d 737, 741–42 (App.Div.1984) (per curiam). There the court affirmed a finding that an agent was negligent in failing to inform the client of the availability of uninsured motorist coverage after he had requested the "best available" insurance. *Id.* 491 A.2d at 738.[2]

Although the majority acknowledges that Wiley "could have done a better job" by informing the Mays more fully, it nonetheless concludes that there is no evidence to support a negligence claim. 844 S.W.2d at 672. Distinguishing *Sobotor* on the grounds that requesting "the best available" insurance is qualitatively different from requesting "good" coverage, 844 S.W.2d at 673, the majority approaches the case from the perspective of the factfinder. The jury here was entitled to find that, in light of all the surrounding circumstances, a reasonable insurance agent in Wiley's position should have informed the Mays of the availability of other policies. In *Kabban v. Mackin*, 104 Or.App. 422, 801 P.2d 883, 891 (1990), the court held that the question of whether the agent should have advised the client of a potential coverage problem was for the jury to determine. Because the trial court had essentially usurped the jury's role through instructions defining the standard of care, the case was reversed and remanded for a new trial. Like the trial judge in *Kabban*, the majority today supplants the jury as factfinder by holding that, even though Wiley's conduct was less than exemplary, the record contains no evidence of his negligence. Because the majority continues its steady erosion of our right to trial by jury, I dissent.

GAMMAGE, Justice, dissenting.

I respectfully dissent. The majority admits an insurance agent has a duty to advise his customers, but concludes that either the duty in this case was so narrow that there was no evidence Wiley negligently failed to give it, or that if he did

---

**2.** Other states have imposed liability in similar situations. *See, e.g., Johnson v. Urie*, 405 N.W.2d 887, 890 (Minn.1987) (reversing summary judgment for insurer based on agent's failure to offer or explain uninsured motorist coverage); *Dimeo v. Burns, Brooks & McNeil, Inc.*, 6 Conn.App. 241, 504 A.2d 557, 559 (1986) (approving jury instructions imposing duty to advise); *Bicknell, Inc. v. Havlin*, 9 Mass.App. 497, 402 N.E.2d 116, 119 (1980) (agent negligent in failing to place sufficient coverage on plain-

tiff's buildings after undertaking to advise as to appropriate coverage); *Precision Castparts Corp. v. Johnson & Higgins of Or., Inc.*, 44 Or.App. 739, 607 P.2d 763, 765 (1980) (agent had duty to inform plaintiff of the "significant distinctions between the alternative insurance policies under consideration"); *see also Darner Motor Sales v. Universal Underwriters, Inc.*, 140 Ariz. 383, 682 P.2d 388, 403 (1984) (noting that an insurance agent acts as an "advisor" with a "duty to speak without negligence").

negligently fail to advise properly, there is no evidence he proximately caused any harm. I disagree with both these conclusions. Wiley was under an affirmative duty to offer advice to the Mays for reasons I set forth below. Because the Mays specifically advised him they wanted to be assured of stable coverage for the children they planned to have, Wiley breached his duty to advise by his insistence on the disastrous Double Eagle policy. Wiley's own admissions that other types of policies would have kept Jared covered is, in context, some evidence of proximate cause. The trial court judgment based on the jury verdict should be affirmed.

The majority holds there is no evidence to support jury findings favoring the Mays. The standard for review of evidence to support jury findings is well established: the court may consider *only* evidence and reasonable inferences drawn therefrom in the light most favorable to support the jury findings, and must disregard *all* contrary inferences and inconsistent evidence. *Lofton v. Texas Brine Corp.*, 777 S.W.2d 384, 387 (Tex.1989); *Lucas v. Texas Industries, Inc.*, 696 S.W.2d 372, 377 (Tex.1984); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). In crucial instances, the majority fails to properly recognize the evidence and clear inferences from it.

Faith May testified that her inquiry to Wiley concerned available health coverage. The inquiry was initially transmitted through Daryl's mother, Alice. Faith testified Alice "told us that she would talk to an agent to find out what policies they offered." Even after questioning and emphasizing her need for the best available and affordable health policy, Faith says the Double Eagle was the sole policy shown. She further testified she emphasized the need for continuing insurance coverage of the children she and Daryl planned to have.

What we are dealing with is the basic duty of an agent to aid his client with affirmative advice.

The principle involved here is simply that a person who holds himself out to the public as possessing special knowledge, skill or expertise must perform his activities according to the standard of his profession. * * *

We are a nation which also prides itself on a tradition of allowing a person to rely upon the words of another who, because of special knowledge, undertakes to act as an advisor. If an agent has an economic self-interest in imparting information, sound policy does require that the agent's duty to speak without negligence be reinforced by basic tort principles inherent in the common law. [Citation omitted.]

*Darner Motor Sales v. Universal Underwriters*, 140 Ariz. 383, 682 P.2d 388, 403 (Ariz.1984).

This "duty to speak" may arise in two different contexts—the blackletter law and what are sometimes called "special circumstances." What I have called the "blackletter" law comes from the usual statement of an insurance agent's duty.[1] Part of that duty is "to have adequate knowledge as to the different companies and the variety of terms available with respect to the undertaking he has assumed." Annot., *Duty and Liability of Insurance Broker or Agent to Insured with Respect to Procurement, Continuance, Terms, and Coverage of Insurance Policies*, 29 A.L.R.2d 171, 187 (1953). The agent must have reasonable knowledge of the types of policies, their different terms, and the coverage available in the area in which the client seeks to be protected. *Seascape of Hickory Point Condominium Ass'n, Inc., Phase III v. Associated Ins. Services, Inc.*, 443 So.2d 488, 490 (Fla.App. [2d Dist.] 1984, rev.

---

1. Annot., T. Groger, *Liability of Insurance Agent or Broker on ground of Inadequacy of Life, Health, and Accident Insurance Coverage Procured*, 72 A.L.R.3d 735, 738 (1976):

[A]n insurance agent or broker, employed by a prospective client to effect insurance on behalf of the client, must exercise such reasonable skill and ordinary diligence as may fairly be expected of a person in his profession or situation, in doing what is necessary to effect a policy, in seeing that it effectually covers the property or risks to be insured, in selecting the insurer and ascertaining that it is of good credit and standing, and in obtaining as good terms as are reasonably possible.

den.). The agent has a duty to disclose the information to the client and to advise the client as to the insurance he seeks. *Darner Motor Sales*, 682 P.2d at 402; *Seascape of Hickory Point*, 443 So.2d at 490; *McAlvain v. General Ins. Co.*, 97 Idaho 777, 780, 554 P.2d 955, 958 (1976); *Kenyon v. Larsen*, 205 Neb. 209, 217, 286 N.W.2d 759, 764 (1980); *Bates v. Gambino*, 72 N.J. 219, 370 A.2d 10 (1977).

There is evidence to support the jury finding that Preston Agency breached this duty. Wiley testified he did not know the differential in premium between the Double Eagle group policy and the policies that could have been obtained outside of a group. Contrary to this admission, the majority asserts the Double Eagle "according to his [Wiley's] testimony, achieved lower rates and lower deductibles by its group structure and by excluding persons who could not answer the health questions affirmatively." 844 S.W.2d at 672. Why accept Wiley's testimony against the jury verdict,[2] but ignore his contrary admissions supporting the verdict?

Wiley further admitted he didn't even do any premium comparisons for the Mays of other "single company" policies that would have avoided the loss of coverage for Jared. The reasonable inference from Wiley's testimony is that he had such other single company policies available.[3] Wiley

was attempting to explain his failure. What the evidence shows is that Wiley never determined what the Mays were willing to pay, that he had policies to sell that would have protected them and Jared, but that he failed to disclose them or offer a comparison of premium costs. This is evidence of the breach and harm caused by Wiley's failure to meet this "blackletter" duty to inform and advise.

All attempts by Wiley to justify his advice to the Mays are suspect. In his pretrial deposition, Wiley testified that he dealt with Faith and Daryl May exclusively through the mother-in-law in procuring their Double Eagle policy; he claimed he never met with them personally. At trial, when confronted with the maternity coverage rider exclusively in his handwriting, Wiley conceded it meant he must have met with the Mays, but he could not recall what was said.

Wiley testified that placing the Mays in a "single company" non-group health insurance policy would have avoided the loss of coverage for Jared, and further admitted that he made no attempt to determine relative cost or show the Mays what the premium difference would be.

There was evidence from which the jury could have reasonably inferred that Wiley had a financial motive to push the Double

---

**2.** In response to the question about what the differences in premiums between the Double Eagle group policy and "single company" policies with the same coverage were, Wiley's testified that "I don't know." The majority asserts we must treat this testimony as not conflicting with Wiley's claim the premiums were lower because "the question itself is phrased in a manner that acknowledges Wiley's earlier statement that the premiums were lower." 844 S.W.2d at 672 n. 14. The majority thus implies that an attorney on cross-examination of an adverse witness may not probe his testimony for truthfulness unless he makes his question so hypothetical that it does not "acknowledge" the testimony sought to be discredited. The majority usurps the jury's job. Resolving conflicts in the evidence was for the jury, which found against the insurance agent.

**3.** Wiley testified:

Q: [W]hen we read your deposition testimony and it's in evidence, the question was that,

"The way Jared fell between the cracks was this changing of underwriters?"
A: Changing from Hermitage to Keystone is where he fell, yes.
Q: Now, there are underwriters of insurance coverage who put people with a single company, and they stay the insured of that company?
A: Right.
Q: And this problem of changing underwriters and that situation is avoided, isn't it?
A: Right.
A: But you never even did so much as a premium check to be able to tell the Mays what the difference between one of those types of plans and this type of plan was, did you?
A: I don't remember whether I did or not.
\* \* \* \* \* \*
Q: Okay. If your deposition says that you didn't, do you stand by what you said in your deposition?
A: As far as I know, I don't guess I did.

Eagle over other policies.[4] The evidence suggested the agent of record started and controlled United Services as a group through which to market the Double Eagle. It selected the underwriters. The underwriters kept changing, but the marketing scheme kept churning out the commissions. Wiley testified selling agent commissions were approximately 15 percent. The Double Eagle went through four underwriters in less than six years, three of which were subject to insolvency proceedings shortly after each withdrew. The Liberty Group was agent of record. A Liberty Group employee testified that it, as agent of record, received commissions from 36 percent to 38 percent of each premium on the Double Eagle.[5] The jury could, and presumably did, take notice that this left a very low percentage for actually paying claims, and thereby increased the risk of "changes" in underwriters.

Wiley testified he was "concerned" that the Double Eagle went through two underwriters, both of which were the subject of insolvency proceedings immediately following their Double Eagle connection, but he never communicated that concern to the Mays. Rather, each time the Mays contacted him to express their concern, he reassured them and urged them to stick with the Double Eagle.

There is clearly evidence that Wiley, lacking adequate knowledge regarding health insurance coverage and policies available, may have placed the Mays into the Double Eagle group for his own profit. There is evidence of negligence. As explained in *Darner Motor Sales*, that is the reason tort law liability should be imposed to require the agent to place his professional duty to advise above his economic interest to sell the client whatever profits the agent, as opposed to what is appropriate for the client's needs.

The second context in which the affirmative duty to advise arises is sometimes called "special circumstances." Included in this term is the duty to give advice when the insurance agent has held himself out as an insurance specialist or insurance expert. *Hardt v. Brink*, 192 F.Supp. 879, 880–81 (W.D.Wash.1961); *Gabrielson v. Warnemunde*, 443 N.W.2d 540, 543 (Minn.1989); *Sobotor v. Prudential Prop. & Cas. Ins. Co.*, 200 N.J.Super. 333, 491 A.2d 737, 740 (App.Div.1984); *Nelson v. Davidson*, 155 Wis.2d 674, 456 N.W.2d 343, 347 (1990). Also classified as special circumstances are those occasions in which the agent expressly or by conduct agrees to give advice to select insurance appropriate for the client's needs. *Nelson v. Davidson*, 456 N.W.2d at 347. One obvious example of this latter circumstance occurs when the client asks the agent to give advice and the agent agrees to do so.

The evidence supports these two types of "special circumstances." Wiley testified that Preston Agency advertised that "the insurance professionals at Preston will take care of your insurance needs." He further admitted the message of their advertising was "something in the concept" that they would tell potential customers to come in and sit and talk with them, and together they would go over their insurance needs, and "we'll tell you what type of coverage you need in a given situation."

Faith May testified they requested advice, and Wiley agreed to give it. The record is replete with evidence that Wiley continued to give the Mays advice long after their initial purchase of the Double Eagle policy.

An insurance agent is liable when he fails to provide accurate information regarding available insurance which he knows or should know the customer desires. *Woodham v. Moore*, 428 So.2d 280 (Fla.App. [4th Dist.] 1983). By holding themselves out as insurance professionals who would give sound advice, the agents

---

**4.** We do not claim the jury actually found Wiley had a financial incentive, and whether he did is irrelevant to the controlling issue of negligence. The existence of such evidence, however, may well have influenced the jurors' perception of the case as a whole.

**5.** An agent-of-record employee's testimony implied the 15 percent writing agent's commission might have come out of the 36 to 38 percent commission to the agent of record. Even 36 percent is high, as the jury was entitled to recognize.

with Preston undertook a duty to select appropriate insurance for the Mays.

To distinguish a number of cases, particularly *Bates v. Gambino, Seascape of Hickory Point* and *Sobotor*, the majority here creates the "misled" requirement. Under the majority's analysis, to be actionable a statement must "mislead" about the availability or adequacy of coverage. Thus, if the agent chooses the inappropriate policy or coverage, it is not "negligent." According to the majority, giving no advice is fine, even if there is a duty to advise, and only giving misleading advice is actionable. The cases do not so limit the agent's duty to advise. Especially in *Sobotor*, where there was no express misleading advice, just a failure to advise, the distinction fails. The majority essentially argues that the Mays lost their negligence cause of action when the jury failed to find misrepresentation. That is not the law. The negligence cause of action is distinct from the misrepresentation cause of action.

The majority places much reliance on *Jones v. Grewe,* 189 Cal.App.3d 950, 234 Cal.Rptr. 717 (1987). Plaintiffs in that case argued the insurance agent had a duty to determine what their worth was, to fix an amount for liability insurance. The obvious distinction is that in *Grewe* the insureds neither specifically asked for the coverage nor informed the insurance agency of the risk that concerned them. Here the Mays informed Wiley that they wanted to be sure of continuous coverage for any children they might have.

The majority accepts evidence and inferences contrary to the jury verdict, and disregards or substitutes its own gloss on evidence supporting the verdict. There was evidence the Preston Agency under the circumstances of this case had the duty to advise the Mays of their insurance needs. It should have either offered them insurance appropriate for their needs or told them it did not offer what they needed. There was also evidence supporting the jury's finding that Preston Agency breached that duty, because it did not disclose any insurance options other than the Double Eagle, which was particularly ill-suited to

the Mays' needs. Preston Agency had its duty to disclose both under the blackletter law and because it held itself out as offering expert insurance advice, agreeing to give the Mays such advice. The majority recognizes no minimum standards of due diligence other than to avoid affirmative misrepresentation. The majority denies the Mays both their facts and the protection they should have under the law. I therefore dissent.

MAUZY, J., joins in this dissent.