**LIVE OAK INSURANCE AGENCY, Appellant,**

**v.**

**William G. "Billy" SHOEMAKE, Appellee.**

**No. 13–02–028–CV.**

Court of Appeals of Texas, Corpus Christi–Edinburg.

Aug. 21, 2003.

Vaughan Waters, Thornton, Summers, Biechlin, Dunham, Corpus Christi, for Appellant.

R. Michael Appell, Adami, McNeill, Paisley & Appell, P.C., Alice, for Appellee.

Before Justices HINOJOSA, CASTILLO, and CHAVEZ.[1]

## OPINION

Opinion by Justice CHAVEZ.

Live Oak Insurance Agency appeals from a judgment that awarded appellee, Billy D. Shoemake,[2] $34,454.50 on a breach of contract claim and attorney fees. In one issue, appellant contends that the trial court erred in submitting the case to the jury, in entering the judgment, and in failing to grant its motion for judgment notwithstanding the verdict ("JNOV") because there was no evidence to support the jury's responses to questions one and two. We affirm.

William G. Shoemake lived near George West, Texas and had obtained an insur-ance policy for his home through the Live Oak Insurance Agency (Live Oak). Live Oak placed the homeowner's insurance policy with Hochheim Prairie Farm Mutual Insurance Company (Hochheim). Sometime in 1994, Mr. Shoemake suffered a stroke that required a period of hospitalization and rehabilitation. Billy Dan Shoemake, his only son, was residing in Tunica, Louisiana, when he was informed of his father's stroke. Billy Dan immediately went to George West to see his father. After a period of hospitalization, it was determined that Mr. Shoemake would require physical rehabilitation and placement in a nursing home. Billy Dan then placed his father in a nursing home and set out to inform the utility companies, post office, Live Oak, and others in and around George West that he would be taking care of his father's business affairs. He requested that all mail and bills be forwarded to his address in Tunica, Louisiana. On December 13, 1996, Mr. Shoemake died.

After Mr. Shoemake's death, Billy Dan returned to George West to arrange for his father's funeral and to wrap up his father's personal and business affairs. One of the businesses he visited was Live Oak. There, Billy Dan spoke to Ms. Lisa Steen, Live Oak's customer representative with whom he had spoken in 1994. Billy Dan testified that he informed Ms. Steen of his father's death and that he wanted "everything switched to [his] name." Billy Dan took no documents to Live Oak to verify his father's death or to verify that he was now the owner of his late father's home. The record does not show that any documents were requested of him or that

---

1. Retired Justice Melchor Chavez, assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to TEX. GOV'T CODE ANN. § 75.002 (Vernon 1998).

2. Although the case is styled, "William G. 'Billy' Shoemake v. Live Oak Insurance Agency," the actual plaintiff is Billy Dan Shoemake. William G. Shoemake, deceased, was the plaintiff's father.

he was asked to sign or fill out any paperwork.

In October 1994, while his father was in the nursing home, Billy Dan renewed his father's truck policy through Live Oak and gave Live Oak his address in Tunica, Louisiana, as the address where the policy was to be sent. Billy Dan also obtained a personal liability insurance policy for Mr. Shoemake. The policies were renewed the following year and sent to Billy Dan in Louisiana. When the insurance on the dwelling came up for renewal in 1994, the renewal notice was sent to Mr. Shoemake in George West, but the post office forwarded it to him at Billy Dan's address in Louisiana. For the 1996 and 1997 renewals, Hochheim again sent the renewal notices to Mr. Shoemake at his address in George West. The notices were returned undelivered to Hochheim, which then forwarded them to Live Oak to be sent to Mr. Shoemake's correct address. Ms. Steen testified that in 1997, she sent the renewal notice to Mr. Shoemake at the Louisiana address along with a Post–It note that read: "Mr. Shoemake, let me know if you still want the policies and what address you would like them sent to. Thanks. Lisa Steen." In response to the Post–It note, Billy Dan's wife called Ms. Steen and again instructed her to the send the policy to the Louisiana address.

On November 9, 1998, when the policy came up for renewal, Hochheim sent Live Oak a memo asking it to locate the correct address for Shoemake and to forward the renewal notice to him. Hochheim also asked for the address to update its records. A second request for Shoemake's correct address was sent to Live Oak on January 6, 1999. Along with this request was a notice that the policy had lapsed as of December 29, 1998 and that the notice

should be forwarded to Shoemake. Ms. Steen, however, could not recall if she complied with the request to forward the renewal notice to Billy Dan. Billy Dan said he never received the notice. As for the lapse notices, Ms. Steen testified that it was the agency's policy not to forward such notices to its insureds.

The Shoemake home was destroyed by fire in April 1999. Hochheim denied the claim because the policy had lapsed December 29, 1998. Billy Dan subsequently brought this lawsuit against Hochheim and Live Oak, alleging negligence, breach of contract, DTPA, and breach of the duty of good faith and fair dealing. Hochheim was discharged on an instructed verdict at the close of the plaintiff's case. Live Oak's motion for instructed verdict was denied and the case was submitted to the jury only on the breach-of-contract theory. The jury returned a verdict in favor of Billy Dan Shoemake. After the denial of Live Oak's motion for JNOV, this appeal followed.

The jury first was asked to determine whether Live Oak had agreed to provide an insurance policy on the Shoemake dwelling for the period of December 14, 1998 through December 14, 1999. If the jury answered question one "yes," it was then to decide if Live Oak had breached that agreement. The jury answered both questions "yes." [3] In its sole issue, Live Oak contends that there was no evidence to support the verdict and judgment notwithstanding the verdict should have been granted.

 A judgment notwithstanding the verdict is proper only when a directed verdict would have been proper. Tex.R. Civ. P. 301; *Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex.

---

**3.** No damage questions were submitted to the jury because the parties had stipulated to the

amount of actual damages and attorney fees at the close of the evidence.

1991); *Wal–Mart Stores, Inc. v. Bolado*, 54 S.W.3d 837, 841 (Tex.App. Corpus–Christi 2001, no pet.). A motion for directed verdict is proper when the evidence does not raise a fact issue on one or more elements that the non-movant must establish to be entitled to judgment. *Koepke v. Martinez*, 84 S.W.3d 393, 395 (Tex.App. Corpus–Christi 2002, pet. denied). When the evidence is no more than a scintilla, it is no evidence. *Rush v. Barrios*, 56 S.W.3d 88, 94 (Tex.App.-Houston [14th Dist.] 2001, pet. denied).

In reviewing the trial court's order granting or denying a motion for JNOV, we must consider only the evidence and the reasonable inferences that support the jury's answers, disregarding all contrary evidence and inferences. *Johnson & Johnson Med., Inc. v. Sanchez*, 924 S.W.2d 925, 929 (Tex.1996); *Best v. Ryan Auto Group, Inc.*, 786 S.W.2d 670, 671 (Tex. 1990). If more than a scintilla of evidence supports the jury's finding, the jury's verdict and not the trial court's judgment must be upheld. *Wal–Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex.2003) (citing *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex.1990)). The evidence supporting a finding amounts to more than a scintilla if reasonable minds could arrive at the finding given the facts proved in the particular case. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995).

Live Oak argues that there was not a valid contract between the parties to provide a policy of insurance on the dwelling because: (1) the agreement was to create a future contract with Hochheim or some other unknown carrier; thus, a contract to make a contract is not a contract; and (2) there was no meeting of the minds. Live Oak also argues that the alleged agreement was, in effect, a contract to create a future contract of insurance with Hochheim or some other carrier due to Mr. Shoemake's death and/or the fact that the dwelling was unoccupied.[4] Although Ms. Steen testified that she saw the notice of Mr. Shoemake's death posted around town and knew he was one of Live Oak's insureds, there is nothing in the record to suggest that Live Oak raised this concern when the policies came up for renewal in 1997 or 1998. The fact that the dwelling was unoccupied or that it may have required placement with another carrier was not the reason the policy was not renewed in 1998. There is nothing in the record that Billy Dan was ever told that he needed to reapply for an insurance policy on the dwelling or that a different type policy was required.

Live Oak also contends that there could not have been a contract because there was not a meeting of the minds. Even if there was an implied contract, argues Live Oak, such a contract can only be formed upon a meeting of the minds between the parties. In support, Live Oak cites *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex.1972) (in implied contract, element of mutual agreement can be implied from and evidenced by parties' conduct and course of dealing). Thus, where the existence of the agreement is disputed, the question of whether an agreement was reached by the parties is generally a question of fact. *Preston Farm & Ranch Supply, Inc. v. Bio–Zyme Enterprises*, 625 S.W.2d 295, 298 (Tex.

4. Reid Holleman, an owner of Live Oak Insurance Agency, testified that a policy could not be issued to a dead person. The new owner would have to reapply for a policy. Also, said Holleman, if the dwelling was unoccupied, a different policy at a higher premium would be required. Hochheim did not write policies on unoccupied dwellings, so Billy Dan's application would have been forwarded to a surplus carrier.

1981). Texas has long recognized that a contract can be formed by conduct. *Id.* Such a contract is one implied in fact. *Id.* The *Preston Farm* court, quoting *Marr–Piper Co. v. Bullis,* 1 S.W.2d 572, 575 (Tex. Comm'n App.1928, judgm't adopted), stated:

> A contract implied in fact is one in which, under the circumstances, the acts of the parties are such as to indicate according to the ordinary course of dealing and the common understanding of men a mutual intention to contract, as where one accepts the tendered service of another under circumstances justifying the inference that such other expected to be paid for such services.... A contract implied from the facts and circumstances in evidence is as binding as would be an expressed one.

*Preston Farm,* 625 S.W.2d at 297.

It is undisputed that Billy Dan visited with Ms. Steen right after Mr. Shoemake suffered the stroke and again after he died. Billy Dan testified he went to inform Live Oak that his father was dead, and that he was now the owner of the dwelling and wanted everything changed to his name. Live Oak argues that there was no agreement because Billy Dan could not remember what Ms. Steen replied when he asked her to change everything to his name. Ms. Steen also had difficulty remembering all of their conversations, but she testified she did not dispute Billy Dan's testimony.

There are other circumstances that support Billy Dan's position. The address on the automobile policy was changed from George West, Texas to Billy Dan's address in Tunica, Louisiana. And although Hochheim continued to send the renewal notices and policies to the George West, Texas

address, Ms. Steen, in turn, when asked by Hochheim, forwarded the new policies to Billy Dan in Louisiana.[5] She did this for at least three years, never questioning the occupancy of the dwelling. The premiums were always paid when she sent Billy Dan the notices.

When asked by Hochheim to forward the policies to the insured, Ms. Steen testified she referred to the Shoemake file to locate Billy Dan's address in Louisiana. Ms. Steen even sent a memo to Billy Dan asking him if he still wanted the policies and where she should send them. In response to this memo, Billy Dan's wife called Ms. Steen to again give her the Louisiana address where she was to send the policies. Although the premium payments should have gone to Hochheim, Billy Dan's wife sent them to Ms. Steen. Clearly, then, Ms. Steen was aware that Billy Dan wanted to keep the dwelling insured. She had continued to send the renewal notices to him in Louisiana and accepted the premium payment when it was sent to her.

Live Oak also argues that while there was a course of dealing for some years between Mr. Shoemake and Live Oak, there was none between Billy Dan and Live Oak because Billy Dan was never one of its insureds. We disagree. *Preston Farm* involved a suit on a sworn account. *Id.* at 296. Preston Farm was sued to collect a debt for the sale of livestock feed. *Id.* It counter-sued, alleging usury. *Id.* at 297. The primary question before the trial court was whether Preston Farm had agreed to pay interest on the account. *Id.* at 298. The court found that there had been extensive dealings between the parties. *Id.* Some twenty different sales had

---

**5.** The testimony was that once the agent places the insurance with an insurance company, the company will mail the renewal notices and charges to the insured and receives the payment. The agent does not get involved in the renewal unless asked to do so.

been made over a year. *Id.* The monthly statements contained service charge provisions that were paid by Preston. *Id.* Preston's representative acknowledged he agreed with the service charges on his account until he found out too much interest was being charged. *Id.*

The supreme court held that from this course of conduct, the trial court could conclude Preston knew or should have known that the service charge was being imposed. *Id.* In upholding the trial court's judgment against Preston, the court said that by his conduct in making continued purchases and payments, he at least impliedly agreed to pay interest on the account. *Id.*

In this case, the insurance policy on the dwelling had been placed with Hochheim by Live Oak since the early 1990's. After Mr. Shoemake's stroke in 1994, it was Billy Dan who informed Live Oak that he wanted the dwelling insured and the policy sent to him. Live Oak complied with his request and continued to send the renewal notices to Billy Dan at his address in Louisiana. This conduct continued even after Live Oak was aware of Mr. Shoemake's death. Although there may not have been as many transactions in this case as in *Preston Farm* (an annually renewable insurance policy generally requires only one such transaction per year), there was sufficient affirmative conduct on Live Oak's part from which the jury could conclude that Live Oak had agreed to provide an insurance policy on the dwelling in question.

Live Oak also argues that the Texas Supreme Court has held that an agent who undertakes to procure insurance for a client owes that client the duty to: (1) use reasonable diligence in attempting to place the requested insurance; and (2) inform the client promptly if unable to do so. In support, Live Oak cites *May v. United*

*Servs. Ass'n. of Am.,* 844 S.W.2d 666, 669 (Tex.1992), and *Moore v. Whitney–Vaky Ins. Agency,* 966 S.W.2d 690, 692 (Tex. App.-San Antonio 1998, no pet.). A claim under these circumstances, asserts Live Oak, sounds in tort and not in contract. As noted above, however, Billy Dan abandoned his negligence and DTPA causes of action and submitted the case to the jury on a breach-of-contract theory.

The *May* case involved the scope of an insurance agent's common-law duty to a customer in rendering advice about and procuring a policy of health insurance. *May,* 844 S.W.2d at 666. The dispute in *May* was not that the agent failed to obtain a policy of insurance for the Mays, but whether the agent had made representations as to the quality, character, or type of coverage that was available under the proposed plan, and whether the Mays relied on the representations in deciding to enroll in the plan. *Id.* at 669–672. That is hardly the case here. Here, the policy was in effect when Billy Dan spoke to Ms. Steen. All Billy Dan wanted was to have everything placed in his name, the dwelling insured, and the renewal notices sent to him in Louisiana. Under the facts of this case, the jury could well infer that Live Oak agreed to do so.

Although there was testimony from Holleman that a policy different than the one in effect in 1994 was required for an unoccupied dwelling, there is simply no evidence in the record that such a requirement was the reason for not sending Billy Dan the renewal notice in 1998. The issue submitted to the jury was the following:

> Do you find that LIVE OAK INSURANCE AGENCY agreed to provide an insurance policy on the dwelling in question for the term of December 14, 1998 through December 14, 1999?

Live Oak's objection was not as to form. The sole objection was that there was no

evidence to support submission of the issue or the existence of a contract.

We hold there was sufficient evidence to support a finding that Live Oak Insurance Agency agreed to provide an insurance policy on the dwelling in question. We overrule appellant's issue and affirm the judgment of the court.