# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00670-CV

**William D. Bryce and Sarah R. Bryce, Appellants // Unitrin Preferred Insurance Co., Cross-Appellant**

**v.**

**Unitrin Preferred Insurance Co.; and Evans, Ewan & Brady Insurance Agency, Inc., Appellees // William D. Bryce and Sarah R. Bryce, Cross-Appellees**

### FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 277TH JUDICIAL DISTRICT NO. 06-961-C277, HONORABLE JACK R. MILLER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

William and Sarah Bryce appeal from a jury verdict in favor of their homeowners' insurance carrier, Unitrin Preferred Insurance Co. ("Unitrin"), and their insurance agent, Evans, Ewan & Brady Insurance Agency, Inc. ("EEB"), on the Bryces' claims for negligence and violations of the insurance code. Unitrin raises a conditional issue on cross-appeal, arguing that the trial court abused its discretion in granting the Bryces' motion for sanctions and motion to strike a supplemental pleading filed by Unitrin. We affirm the trial court's judgment.

## BACKGROUND

In April 2006, a fire destroyed the Bryces' home in Georgetown, Texas. At the time of the fire, the Bryces' home was insured by Unitrin under a "replacement cost" policy, intended to

cover the cost, up to policy limits, of reconstructing the home after a loss. As a result of the fire, Unitrin paid the Bryces their full policy limits of $474,000 for the dwelling and $284,400 for the contents of the home.[1] The actual replacement cost, however, of both the dwelling and the personal property far exceeded the policy limits. In December 2006, the Bryces filed suit against Unitrin and EEB, alleging causes of action for negligence and violations of the insurance code, and seeking damages in the amounts necessary to fully rebuild the home and replace their personal property.[2] The Bryces' experts estimated that the replacement cost of the home was approximately $1.7 million and that the replacement cost of their personal property was approximately $864,000. The Bryces asserted that their home was grossly underinsured because Unitrin and EEB negligently set inadequate policy limits and failed to disclose to the Bryces that their insurance coverage would not cover the full replacement cost of the home and its contents.

The Bryces' home was built in 1889 and is located in a registered historic district of Georgetown. The Bryces purchased the house in 1983 for $210,000 and immediately invested approximately $242,000 in renovations, bringing the total purchase and renovation cost to approximately $452,000. From the time they purchased their home until some time after the fire, the Bryces used EEB as their insurance agent.

EEB initially placed the Bryces' homeowners insurance with Safeco. In 1984, Mr. Bryce sent a written request to EEB to have the replacement-cost coverage of the dwelling increased

[1] Unitrin paid the Bryces an additional $5,000 for the cost of compliance with new construction codes and ordinances, as well as their loss-of-use policy limit of $94,800.

[2] The Bryces also sought damages for additional living expenses, lost time for Mrs. Bryce's work calculating their personal property losses, expert and attorneys' fees, and additional damages under the insurance code.

2

to $285,000. EEB complied with this request, obtaining increased coverage for the home. After 1984, the Bryces made no further requests to adjust their coverage limits.

In 1992, the Bryces notified EEB that they wished to change homeowners' insurance carriers. As a result, EEB submitted a new insurance application to Lumbermens Mutual Casualty Company ("Lumbermens"), listing the dwelling coverage amount as $375,000, a figure adopted from the Bryces' policy from the preceding year and based on the $285,000 coverage amount requested by Mr. Bryce in 1984, adjusted for inflation.[3] Lisa Roppolo, a customer service representative and officer manager at EEB, testified that she discussed the new application and coverage amounts with Mrs. Bryce, who "agreed with those numbers." The application mistakenly listed the home's year of construction as 1939, rather than 1889.

After receiving the Bryces' application and issuing the policy, Unitrin followed its standard procedure of ordering an inspection of the property within 60 days of issuing the policy. The inspection performed on the home was a "low-value," or exterior-only, inspection that estimated the replacement cost of the home to be $192,000, far less than the coverage amount requested on the application. After reviewing the inspection report, a Unitrin underwriter noted in the file that a high-value inspection of both the interior and exterior should have been performed, and further noted that due to the elaborate woodwork, Greek columns, and other aspects of the home, "I would not feel

---

[3] In 2002, Lumbermens sold its homeowners' business to Unitrin. All Lumbermens policies renewed after July 1, 2002, including the Bryces' policy, became Unitrin contracts for purposes of liability. As a result, we will refer to actions of Lumbermens in connection with the Bryces' homeowners' policy as actions of Unitrin. Unitrin was also granted a limited, non-exclusive right to use the name "Kemper" after July 1, 2002, as Lumbermens was a Kemper insurance company.

comfortable recommending less coverage." As a result, the dwelling coverage limit on the policy remained $375,000, consistent with the coverage amount requested on the application. Over the years, Unitrin made periodic inflation adjustments to this coverage amount based on an inflation factor used to reflect increased costs of construction.

Unitrin requested another inspection of the Bryces' home in 1998 after discovering that the actual construction date of the home was 1889, rather than 1939.[4] The 1998 inspection did not prompt Unitrin to suggest any change to the Bryces' amount of coverage, which by that time had increased to $428,000 due to the inflation adjustments. A third inspection was ordered in 2001, but Unitrin has no record that this inspection actually occurred.

In 2002, a Unitrin claims adjuster made a visit to the Bryces' home in response to a mold claim. This adjuster subsequently notified the Unitrin underwriting department that he believed the home to be "way underinsured." The underwriter made note of this conversation in a diary entry for the Bryces' file, further stating, "I ordered high value inspection for condition/maintenance/ITV concerns."

As noted in the underwriter's diary entry, Unitrin ordered an inspection of the home to determine whether the adjuster's concerns were warranted. The record reflects that EEB was notified of the inspection, as a July 10, 2002, transaction detail from EEB's internal file states, "Wes from Kemper called. He is having this house inspected. He would like us to inform Mr. Bryce of the pending inspection." The transaction detail further notes that the Unitrin underwriters "believe

---

[4] Unitrin did not maintain a copy of the resulting inspection report, but the underwriting diary for the policy does include a note dated August 3, 1998, stating, "Inspector note[s] this is a very well maintained vintage home."

4

Mr. Bryce's house is under-insured." The Bryces maintain that they received no notice of the inspection.

Unitrin ordered the 2002 inspection from Millennium Information Services, Inc. ("Millennium"), who in turn assigned the inspection to Reliable Reports of Texas, Inc. ("Reliable"). The resulting inspection report was problematic in a number of ways.[5] While Unitrin sought a high-value inspection due to the historical nature of the home, the inspection that was actually performed was a low-value, exterior-only inspection. As a result, no interview with the Bryces was performed, as would have been done for a high-value inspection. The inspection report also mistakenly listed the year of construction as 1939, rather than the correct date of 1889.

The inspection report indicated that the Bryces' home was not only adequately insured, but overinsured, estimating the replacement cost of the home at $331,942, approximately $114,000 less than the policy limit at that time. Relying on the inspection report, Unitrin determined that the adjuster was incorrect in his belief that the home was underinsured. No changes were made to the policy limits and the Bryces were not informed of the adjuster's initial concern that their home was underinsured.

Roppolo testified regarding a phone call she had with Mrs. Bryce in 2002, in which Mrs. Bryce called EEB to inquire about the proper amount of replacement-cost coverage for the Bryces' vacation home in New Mexico. According to Roppolo, she advised Mrs. Bryce to speak

---

[5] The reasons for the inaccurate inspection are unclear. While Unitrin asserted third-party negligence and contribution claims against Reliable and Millennium, these claims were settled prior to trial. The negligence of both Reliable and Millennium was submitted to the jury, who determined that the Bryces' damages were not proximately caused by any negligence on the part of Reliable or Millennium.

with a builder or appraiser in order to determine the replacement cost of the home. Roppolo explained in her testimony that this advice applied equally to the home in Georgetown, stating, "[W]hen you're telling a customer that they need to go out and get a builder, I would assume they would make the assumption that that's how you would do it on any policy."

Mrs. Bryce, on the other hand, testified to another conversation she had with an employee at EEB about the replacement cost of her home. According to Mrs. Bryce, she called EEB sometime in 2004 or 2005 to inquire about her homeowners' policy because she believed the premiums were too high. Mrs. Bryce stated that during that conversation, someone from EEB told her that homes in the Bryces' neighborhood could typically be rebuilt for $100 per square foot and that the Bryces' replacement cost coverage was consistent with this amount. Mrs. Bryce did not identify the name of the employee who gave her this information. Roppolo testified, however, that EEB had no record of such a conversation and that EEB agents typically did not have replacement-cost-per-square-foot information available.

The jury also heard evidence that the Bryces repeatedly declined EEB's requests that they appraise and schedule the contents of their home, maintaining only $284,000 in personal property coverage despite the fact that their collection of Persian and oriental rugs was valued at approximately $119,000 and their collection of antiques was valued at more than $265,000. Roppolo testified that Mrs. Bryce chose not to schedule her valuable antiques, rugs, clothes, and other personal items because the premiums were too expensive, and that the Bryces also declined insurance coverage for the contents of their New Mexico home due to the expense. In addition, EEB records were admitted into evidence indicating that Mrs. Bryce had made numerous complaints

6

about the cost of her homeowners' insurance premiums over the years.[6] Mrs. Bryce herself testified that she usually called EEB with questions about her insurance premiums each time she received a bill, stating, "I always wanted it to be less, [rather] than going up all the time." Mr. Bryce also testified that he and his wife made a conscious decision not to purchase additional insurance to cover their antiques and other valuable personal property because the premiums were too costly.

After hearing the evidence, the jury returned a unanimous verdict that the Bryces' negligence alone proximately caused their home to be underinsured.[7] The jury further found that neither Unitrin nor EEB committed unfair or deceptive acts in violation of the insurance code. The trial court subsequently entered judgment that the Bryces take nothing on their claims. This appeal and cross-appeal followed.

### STANDARD OF REVIEW

The Bryces challenge the factual sufficiency of the evidence to support the jury's findings. To evaluate the factual sufficiency of the evidence to support a jury finding, we consider all of the evidence, setting aside the verdict only if the evidence supporting the finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust.

---

[6] For example, one letter from an EEB agent to Mrs. Bryce, dated February 1994, states, "Per our phone call of last Friday, I have been pleading your case with our Kemper underwriter. He felt that since he had already reduced your auto premium from $1735 to $1203, with two auto losses, he could not improve your Home pricing." The letter goes on to say, "I've gone to bat for you with all the appropriate people. . . . All that Kemper has done for you has been an exception to their rules. Your losses do not justify what their underwriting guidelines require, but they have waived those guidelines to help me."

[7] The jury charge asked whether the negligence, if any, of Unitrin, EEB, Millennium, Reliable, or the Bryces proximately caused the home to be underinsured. The jury answered "no" as to each party except the Bryces.

7

*See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). We may not substitute our judgment for that of the jury, even if the evidence would clearly support a different result. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998).

## DISCUSSION

In three issues on appeal, the Bryces argue that (1) the trial court erred by including the Bryces in the negligence question submitted to the jury, (2) the jury's finding that the Bryces' negligence alone proximately caused their home to be underinsured is not supported by factually sufficient evidence, and (3) the jury's finding that neither Unitrin nor EEB made any misrepresentations in violation of the insurance code is not supported by factually sufficient evidence.

*Inclusion of the Bryces' Negligence in the Jury Charge*

In their first issue on appeal, the Bryces argue that the trial court erred in submitting their negligence to the jury because they had no duty to set the replacement cost of their home. In response, Unitrin and EEB argue that the Bryces waived this complaint because they did not object to the submission of their negligence based on any lack of duty. Rather, they objected only on the basis that there was no evidence to support a finding of negligence. At oral argument, the Bryces conceded that the issue of whether they had a duty to set replacement cost was not properly preserved for appellate review. As a result, we need not address the Bryces' first issue on appeal.

*Factual Sufficiency of Negligence Finding*

In their second issue on appeal, the Bryces argue that the evidence is factually insufficient to support the jury's finding that the negligence of the Bryces, as opposed to any negligence on the part of Unitrin or EEB, proximately caused the home to be underinsured. The Bryces present three arguments in support of their contention that the jury's finding is factually insufficient. First, they argue that Unitrin and EEB were negligent because they knew the home was underinsured and failed to notify the Bryces. Second, they argue that Unitrin negligently set, maintained, and failed to correct the inadequate replacement cost coverage limit. Finally, they assert that there is no evidence that the Bryces themselves were negligent with respect to the coverage limits on their homeowners' insurance policy.

### 1.) *Failure to Notify*

The Texas Supreme Court has stated that "an insurance agent who undertakes to procure insurance for another owes a duty to a client to use reasonable diligence in attempting to place the requested insurance and to inform the client promptly if unable to do so." *May v. United Servs. Ass'n*, 844 S.W.2d 666, 669 (Tex. 1992). Relying on this language, the Bryces argue that by allowing their home to be insured for less than its full replacement cost, EEB failed to obtain the requested coverage and therefore should have informed them of its inability to do so. The Bryces further argue that the *May* standard should apply to insurance carriers as well, so that both Unitrin and EEB breached a duty to inform the Bryces that they were underinsured.

A fair reading of *May* reveals only two duties on the part of an insurance agent: (1) the duty to use due diligence in obtaining the requested coverage; and (2) the duty to notify the

client promptly if unable to do so. *Id. May* does not, as the Bryces contend, create a duty on the part of either an agent or an insurance carrier to monitor an insured's policy in order to ensure that the requested coverage is adequate. For that matter, it is not necessarily the case that a replacement cost policy covering less than 100% of the replacement cost of the dwelling is inadequate, as Unitrin's expert witness testified that it is widely accepted in the insurance industry that an insured might choose to insure their home at less than the full replacement cost, particularly if the insured wants to reduce their insurance premiums.[8]

It is undisputed that the Bryces sought a replacement-cost homeowners' insurance policy, and that EEB obtained such a policy in the amount requested by the Bryces. Mr. Bryce specifically requested $285,000 in replacement cost coverage for the dwelling in 1984, and EEB complied with this request. The Bryces made no further requests for changes to their coverage limits, and as a result, no further changes were made other than inflation adjustments. Thus, EEB fulfilled its obligation under *May* to exercise reasonable diligence in obtaining the policy requested by the insureds. *See id.* Similarly, assuming the *May* standard is applicable to an insurance carrier, the evidence also establishes that Unitrin provided replacement-cost coverage in the amount requested by the Bryces in their 1992 application, making only periodic adjustments for inflation as required under the policy.

The Bryces argue, however, that regardless of the amount of coverage they actually requested in their application, Unitrin and EEB had a duty to inform them that their insurance

---

[8] When asked whether it is customary for an insurance company to inform a policyholder that their home is not insured up to its full replacement cost, the expert witness answered, "Bursting out with it and saying it might actually constitute an embarrassment to somebody you want to be a customer, so it's unlikely that you're going to do that and you have no obligation to do it."

coverage was inadequate to cover the full replacement cost of the home. We find no support for this proposition in *May* or any other Texas case, but even assuming that such a duty exists, the great weight and preponderance of the evidence supports a finding that neither Unitrin nor EEB knew the Bryces' home was underinsured. The Bryces emphasize the fact that a Unitrin claims adjuster notified the underwriting department in 1992 that he believed the home to be underinsured. It is undisputed that Unitrin ordered an inspection in response to the claims adjuster's concerns and determined, based on that inspection, that the concerns were unfounded and that the home was adequately insured.

Similarly, while EEB was notified by Unitrin that the underwriting department had ordered an inspection out of concern that the home was underinsured, EEB received no further information on the matter, prompting it to assume, correctly, that the ordered inspection had satisfied any concerns about the amount of the Bryces' coverage. Ingrid Schultz, an underwriter for Unitrin, testified that EEB would have every reason to believe the Bryces' home was adequately insured because no inspection report—from 2002 or otherwise—was ever forwarded to EEB. Roppolo testified that if the 2002 inspection *had* indicated that the home was underinsured, EEB would have received notification to that effect from Unitrin, along with a copy of the appraisal and a letter "letting us know that we needed to get with the insured and increase the coverages."[9]

Both Unitrin and EEB are in the business of selling insurance, and as Schultz testified, it's in "everyone's best interest to have a home be adequately insured." Had Unitrin or

_____

[9] Roppolo also testified that she would not normally inform an insured of an insurance carrier's belief that their home might be underinsured unless a subsequent appraisal confirms that the suspicions are correct. Here, the subsequent appraisal indicated, however inaccurately, that the home was more than adequately insured.

11

EEB been aware that the home was insured for less than the full replacement cost, it would have been in their best interest to notify the Bryces and recommend a larger amount of coverage. The fact that Unitrin and EEB did not do so further suggests that they were unaware that the home was underinsured.[10]

In light of the foregoing, we conclude that the evidence is factually sufficient to support a finding that neither Unitrin nor EEB knew that the Bryces' home was insured for less than the full replacement cost of the dwelling. Accordingly, neither Unitrin nor EEB incurred a duty, assuming one exists, to notify the Bryces that their home was insured for less than the actual replacement cost.

*2.) Setting, Maintaining, and Failing to Correct Coverage Limits*

The Bryces contend that Unitrin was negligent in "setting, maintaining and failing to correct the replacement cost limit" on their insurance policy. However, the record is clear that Unitrin did not set the Bryces' policy limit, but simply adopted the dwelling coverage amount requested by the Bryces on their 1992 insurance application. Roppolo testified that she discussed the application with Mrs. Bryce before submitting it to Unitrin, and that Mrs. Bryce "agreed with those numbers." Furthermore, the replacement cost amount listed on the application was adopted

---

[10] Unitrin's belief that the home was adequately insured is also supported by the fact that Unitrin never applied a co-insurance penalty to the numerous claims made by the Bryces over the years, despite the fact that the Bryces' policy included a provision stating that if the home is insured for less than 80% of its actual replacement cost, a co-insurance penalty would apply to any claims made under the policy. The fact that no co-insurance penalty was ever imposed suggests that Unitrin believed the home to be insured to at least 80% of its actual replacement cost.

from the coverage amount on the Bryces' previous homeowners' policy, a figure based on the coverage amount requested by Mr. Bryce in 1984, adjusted for inflation.

Similarly, the evidence reflects that Unitrin did not negligently maintain or fail to correct the replacement cost limit, as it was up to the Bryces to make any desired adjustments to their replacement cost coverage. Schultz testified at trial that it is ultimately the insureds' choice on how much coverage they wish to obtain for their home, and that while Unitrin prefers homes to be insured to 100% of their actual replacement cost, it is not required under the policy. The Bryces were free to intentionally insure their home for less than the full replacement cost, and there is evidence that they did so, as the $285,000 coverage amount requested by Mr. Bryce in 1984 was far less than the actual purchase price and renovation costs of the home, a total of approximately $452,000.[11]

The Bryces further contend that Unitrin undertook a duty to maintain the proper replacement cost amount of their home because it periodically increased their policy limit over the years. The record reflects that these adjustments were not made, as the Bryces contend, "to make sure that the coverage limit accurately reflected the amount needed to replace the house." Rather, these adjustments were made automatically pursuant to a built-in inflation factor included in the Bryces' policy. The adjustments simply ensured that the coverage amount provided under the policy represented the present value of the coverage amount requested by the Bryces on their initial insurance application.

_____

[11] We note that the purchase price of the home covered the purchase of both the lot and the dwelling, so that the actual replacement cost of the home would not necessarily have been as high as $452,000 in 1984.

13

The Bryces also argue that by ordering inspections of the home, Unitrin undertook a duty to ensure the adequacy of the dwelling coverage amount. In support of this argument, the Bryces claim that Unitrin initially inspected the home in 1992 for the purpose of determining replacement cost. This statement is inconsistent with Schultz's testimony, as she explained that Unitrin performs an initial inspection of every insured home, not for the purpose of setting the coverage amount, but in order to inspect the property for hazards and determine if Unitrin wants to take on the risk of insuring the home. According to Schultz, at the time of an initial inspection, the policy has already been issued and the replacement cost has already been set based on the amount requested by the insured in the application.

The Bryces also claim that Unitrin negligently relied on the 1992 inspection to set their coverage amount, despite the fact that the inspection was "too flawed to render an accurate replacement cost." It bears repeating that Unitrin did not rely on the 1992 inspection to set the dwelling coverage amount, but relied instead on the coverage amount requested by the Bryces in their application. Unitrin's underwriting file indicates that while the 1992 inspection estimated the replacement cost of the home at $192,000, the underwriter chose not to recommend less coverage than the $375,000 amount requested by the Bryces.

Furthermore, Unitrin's expert witness on the insurance industry testified that when an insurer orders an inspection of a home, the inspection is done for the benefit of the company, rather than the insured. According to Unitrin's expert, an insurance company may order an inspection to determine whether the home poses risks or hazards that the company does not wish to undertake. On cross-examination, the expert maintained that it would be consistent with insurance

14

industry customs and practice for an insurer to inspect a home and never inform the homeowner that the inspection occurred, stating, "It's not for the benefit of the insured. It's for the benefit of the insurer, and if they're getting bad information, then they make bad decisions, but the fact that they don't disclose it is not a violation of any obligation." Schultz also testified regarding Unitrin's practice of performing inspections, explaining that Unitrin does not "set the coverage, so the inspection report is for the underwriter's benefit."

With respect to Unitrin's 2002 inspection of the Bryces' home, the evidence reflects that the inspection was not ordered for the purpose of calculating the replacement cost, but to determine whether the claims adjuster was correct in his belief that the home was underinsured. By all accounts, the resulting inspection report indicated that the current coverage amount was higher than necessary to cover the full replacement cost of the home. After the inspection, Unitrin did not recommend that the Bryces lower their policy limits to the replacement cost reflected in the inspection report, as one might expect if the inspection was in fact performed for the purpose of calculating the Bryces' replacement cost and setting coverage limits. Rather, Unitrin continued to insure the home for the amount requested by the Bryces, as the 2002 inspection had served its purpose of assuaging Unitrin's concern that the house might be underinsured.

Taking into account all of the evidence presented at trial, we conclude that there is factually sufficient evidence to support a finding that Unitrin did not undertake any duty to calculate, set, or maintain the replacement cost coverage limits on the Bryces' home.

### 3.) *Evidence of the Bryces' Negligence*

Finally, the Bryces contend that there is no evidence to support a finding that they were negligent in setting the coverage limits because they had no duty to determine the appropriate

15

coverage limits of their own insurance policy and because they relied on the coverage amount set by Unitrin and EEB.

Again, it was the Bryces, not Unitrin or EEB, who initially set the coverage limits for their insurance policy. As the homeowners, the Bryces were in the best position to determine the amount of coverage they wished to obtain, as well as the actual replacement cost of the home. Unitrin's expert witness testified that insurers do not customarily set or determine replacement cost values, and that there is a presumption in the insurance industry that policyholders know the value of their own property. Schultz also testified that Unitrin had an expectation "that the people living in the house with knowledge of the house would know the most about the home."

The jury heard evidence that the Bryces were sophisticated parties, capable of understanding their homeowners' insurance policy, the correspondence they received from EEB, and the value of their home and personal property. Mr. Bryce is an attorney practicing real estate law, as well as the publisher of a legal journal, while Mrs. Bryce assists with the journal publication and handles the household finances. In addition, evidence was presented that the Bryces successfully protested their property tax assessment in 2002 and again in 2004 on the ground that the appraised market value was too high.

Annual renewal letters from EEB to the Bryces, directing them to review the coverage limits on their policy and notify EEB immediately if the coverage amounts were insufficient, were entered into evidence.[12] The jury also heard evidence that Mrs. Bryce regularly called EEB to

---

[12] Specifically, the annual renewal letters included the following language:

Although we attempt to keep up with the needs of each of our insureds, there may be changes needed in the coverage or limits under the policy. Please check the policy and its limits, in order that any changes may be made at once. If the policy is not

complain about the cost of their insurance premiums, that the Bryces' sole request to change their coverage limits in 1984 left the home insured for an amount far less than the total purchase price and renovation cost, and that the Bryces declined to increase their personal property coverage despite multiple recommendations from EEB that they do so.[13]  Mr. Bryce testified that they chose not to increase the coverage on their personal property because the premiums were too expensive.  He further testified that he did no independent analysis to determine whether his personal property coverage amounts were sufficient to cover the replacement cost of his personal property.  As previously discussed, the Bryces had a $284,000 policy limit on their personal property, despite the fact that their personal property included, among other valuables, a collection of Persian and oriental rugs worth approximately $119,000 and a collection of antiques valued at more than $265,000.

The evidence regarding the Bryces' New Mexico vacation home further suggests that the Bryces were aware of their responsibility to determine replacement cost and set coverage limits accordingly.  Roppolo testified that she advised Mrs. Bryce to hire a builder to estimate the replacement cost of the New Mexico dwelling, further stating that she assumed Mrs. Bryce would understand that this advice applied equally to the home in Georgetown.  With respect to that phone conversation, Unitrin's expert witness testified, "[I]f you receive that kind of advice with respect to one home, I find it difficult to believe that you don't realize that it's applied to two homes."[14]  The

---

correct in any manner, inform us at once.  If the coverage is not enough, inform us at once.

[13]  Letters from EEB encouraging the Bryces to schedule their valuables by a separate endorsement to ensure that they were fully insured were admitted into evidence.

[14]  It is unclear whether Mrs. Bryce consulted a builder to estimate the replacement cost of the New Mexico home before the Georgetown home was destroyed by the fire.  She stated in her deposition that she did not hire a builder to determine the replacement cost of the New Mexico home

17

record also reflects that the Bryces declined to insure the contents of the New Mexico home, opting instead to insure the home through a less expensive fire policy that covered only the dwelling itself. Roppolo testified that she obtained quotes for the Bryces to insure the contents of the home and to insure the home under a homeowners' policy rather than a less comprehensive fire policy, but that the Bryces declined this coverage due to the expense.[15]

Finally, while Mrs. Bryce testified that she believed the home to be adequately insured based on her phone conversation with an unidentified EEB employee who informed her that homes in the Bryces' neighborhood could be rebuilt for $100 per square foot, the jury was free to disbelieve this testimony, particularly given Roppolo's testimony that EEB agents do not have price-per-square-foot information readily available and generally would not give that type of information to a client over the phone.

Given the evidence regarding the Bryces' level of sophistication, their demonstrated attempts to minimize insurance costs, the fact that EEB informed Mrs. Bryce that she needed to consult a builder in order to calculate a home's replacement cost, and the fact that Mr. Bryce initially set the dwelling policy limit in an amount far less than the purchase price and remodeling cost of the home, we find the evidence factually sufficient to support a finding that the Bryces' negligence

---

until after the fire, but testified at trial, "I think I consulted two builders, two different times," and that she consulted one of those builders regarding the New Mexico home prior to the fire. It is undisputed that the Bryces did not consult a builder regarding the replacement cost of the Georgetown home at any time before the fire.

[15] Roppolo also testified that at one point, Mrs. Bryce made a theft claim under the fire policy on the New Mexico home, and indicated to the claims adjuster that she believed she had contents coverage, despite the fact that EEB had repeatedly notified her that she lacked contents coverage.

proximately caused the dwelling coverage limits on their homeowners' insurance policy to be far lower than the actual replacement cost of the home.

We conclude that the jury's finding that the Bryces' negligence alone proximately caused their damages is not so weak or against the overwhelming weight of the evidence as to be clearly wrong and unjust. We overrule the Bryces' second issue on appeal.

*Factual Sufficiency of Misrepresentation Finding*

In their third issue on appeal, the Bryces argue that the evidence is factually insufficient to support the jury's finding that Unitrin and EEB made no misrepresentations in violation of the insurance code. *See* Tex. Ins. Code Ann. § 541.061(1)-(2) (West 2009) (governing misrepresentations of insurance policies by "making an untrue statement of material fact" or "failing to state a material fact necessary to make other statements not misleading"). According to the Bryces, the great weight of the evidence establishes that Unitrin and EEB misrepresented the replacement cost of the home by issuing a policy for less than the full replacement cost and by failing to alert the Bryces that the home was underinsured.

We have already concluded that neither Unitrin nor EEB was aware that the Bryces' home was underinsured prior to the fire. While a Unitrin claims adjuster reported concerns regarding the adequacy of the Bryces' insurance in 2002, a subsequent inspection indicated to Unitrin's satisfaction that the home was more than adequately insured. Furthermore, there is no evidence of any kind that Unitrin made any representation to the Bryces that their insurance coverage was adequate to cover the full replacement cost of the home. Rather, Unitrin's policy statements merely reflect the dwelling coverage limit requested by the Bryces, and do not purport to reflect the full replacement cost. With respect to EEB, the only evidence suggesting that a representation was made

19

regarding the replacement cost of the home was Mrs. Bryce's testimony that she had a phone conversation with an unidentified EEB employee who informed her that the replacement cost for homes in her area was $100 per square foot and that her dwelling coverage was consistent with this amount. As previously discussed, the jury was free to disbelieve this testimony, particularly in light of the conflicting testimony from Roppolo. As a result, we conclude that the jury's finding that neither Unitrin nor EEB violated the insurance code is not so weak or against the overwhelming weight of the evidence as to be clearly wrong and unjust. The Bryces' third issue on appeal is overruled.

*Conditional Cross-Appeal*

In a single issue on cross-appeal, Unitrin argues that the trial court abused its discretion in granting the Bryces' motion for sanctions and striking Unitrin's supplement to its first amended answer. Unitrin's point of error on cross-appeal is presented conditionally, to be addressed only in the event that we reverse the trial court's judgment and remand for a new trial. Because we affirm the trial court's judgment, we need not reach Unitrin's conditional issue on cross-appeal.

## CONCLUSION

We affirm the trial court's judgment.

_____

Diane M. Henson, Justice

Before Justices Patterson, Puryear and Henson

Affirmed

Filed: April 1, 2010

20